(Slip Opinion) OCTOBER TERM, 2018 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HERRERA *v.* WYOMING

### CERTIORARI TO THE DISTRICT COURT OF WYOMING, SHERIDAN COUNTY

No. 17–532. Argued January 8, 2019—Decided May 20, 2019

An 1868 treaty between the United States and the Crow Tribe promised that in exchange for most of the Tribe's territory in modern-day Montana and Wyoming, its members would "have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon . . . and peace subsists . . . on the borders of the hunting districts." 15 Stat. 650. In 2014, Wyoming charged petitioner Clayvin Herrera with off-season hunting in Bighorn National Forest and being an accessory to the same. The state trial court rejected Herrera's argument that he had a protected right to hunt in the forest pursuant to the 1868 Treaty, and a jury convicted him. On appeal, the state appellate court relied on the reasoning of the Tenth Circuit's decision in *Crow Tribe of Indians* v. *Repsis,* 73 F. 3d 982—which in turn relied upon this Court's decision in *Ward* v. *Race Horse*, 163 U. S. 504—and held that the treaty right expired upon Wyoming's statehood. The court rejected Herrera's argument that this Court's subsequent decision in *Minnesota* v. *Mille Lacs Band of Chippewa Indians*, 526 U. S. 172, repudiated *Race Horse* and therefore undercut the logic of *Repsis*. In any event, the court concluded, Herrera was precluded from arguing that the treaty right survived Wyoming's statehood because the Crow Tribe had litigated *Repsis* on behalf of itself and its members. Even if the 1868 Treaty right survived Wyoming's statehood, the court added, it did not permit Herrera to hunt in Bighorn National Forest because the treaty right applies only on unoccupied lands and the national forest became categorically occupied when it was created.

*Held*:

1. The Crow Tribe's hunting rights under the 1868 Treaty did not expire upon Wyoming's statehood. Pp. 6–17.

(a) This case is controlled by *Mille Lacs*, not *Race Horse*. *Race Horse* concerned a hunting right guaranteed in an 1868 treaty with the Shoshone and Bannock Tribes containing language identical to that at issue here. Relying on two lines of reasoning, the *Race Horse* Court held that Wyoming's admission to the United States in 1890 extinguished the Shoshone-Bannock Treaty right. First, the doctrine that new States are admitted to the Union on an "equal footing" with existing States led the Court to conclude that affording the Tribes a protected hunting right lasting after statehood would conflict with the power vested in those States—and newly shared by Wyoming— "to regulate the killing of game within their borders." 163 U. S., at 514. Second, the Court found no evidence in the Shoshone-Bannock Treaty itself that Congress intended the treaty right to continue in "perpetuity." *Id.*, at 514–515. *Mille Lacs* undercut both pillars of *Race Horse*'s reasoning. *Mille Lacs* established that the crucial inquiry for treaty termination analysis is whether Congress has "clearly express[ed]" an intent to abrogate an Indian treaty right, 526 U. S., at 202, or whether a termination point identified in the treaty itself has been satisfied, *id.*, at 207. Thus, while *Race Horse* "was not expressly overruled" in *Mille Lacs*, it "retain[s] no vitality," *Limbach* v. *Hooven & Allison Co.*, 466 U. S. 353, 361, and is repudiated to the extent it held that treaty rights can be impliedly extinguished at statehood. Pp. 6–11.

(b) *Repsis* does not preclude Herrera from arguing that the 1868 Treaty right survived Wyoming's statehood. Even when the elements of issue preclusion are met, an exception may be warranted if there has been an intervening "'change in [the] applicable legal context.'" *Bobby* v. *Bies*, 556 U. S. 825, 834. Here, *Mille Lacs*' repudiation of *Race Horse*'s reasoning—on which *Repsis* relied—justifies such an exception. Pp. 11–13.

(c) Applying *Mille Lacs*, Wyoming's admission into the Union did not abrogate the Crow Tribe's off-reservation treaty hunting right. First, the Wyoming Statehood Act does not show that Congress "clearly expressed" an intent to end the 1868 Treaty hunting right. See 526 U. S., at 202. There is also no evidence in the treaty itself that Congress intended the hunting right to expire at statehood, or that the Crow Tribe would have understood it to do so. Nor does the historical record support such a reading of the treaty. The State counters that statehood, as a practical matter, rendered all the lands in the State occupied. Even assuming that Wyoming presents an accurate historical picture, the State, by using statehood as a proxy for occupation, subverts this Court's clear instruction that treaty-protected rights "are not impliedly terminated upon statehood." *Id.*, at 207. To the extent that the State seeks to rely on historical evi-

dence to establish that all land in Wyoming was functionally "occupied" by 1890, its arguments fall outside the question presented and are unpersuasive in any event. Pp. 13–17.

2. Bighorn National Forest did not become categorically "occupied" within the meaning of the 1868 Treaty when the national forest was created. Construing the treaty's terms as "'they would naturally be understood by the Indians,'" *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 676, it is clear that the Tribe would have understood the word "unoccupied" to denote an area free of residence or settlement by non-Indians. That interpretation follows from several cues in the treaty's text. For example, the treaty made the hunting right contingent on peace "among the whites and Indians on the borders of the hunting districts," 15 Stat. 650, thus contrasting the unoccupied hunting districts with areas of white settlement. Historical evidence confirms this reading of "unoccupied." Wyoming's counterarguments are unavailing. The Federal Government's exercise of control and withdrawing of the forest lands from settlement would not categorically transform the territory into an area resided on or settled by non-Indians; quite the opposite. Nor would mining and logging of the forest lands prior to 1897 have caused the Tribe to view the Bighorn Mountains as occupied. Pp. 17–21.

3. This decision is limited in two ways. First, the Court holds that Bighorn National Forest is not categorically occupied, not that all areas within the forest are unoccupied. Second, the state trial court decided that Wyoming could regulate the exercise of the 1868 Treaty right "in the interest of conservation," an issue not reached by the appellate court. The Court also does not address the viability of the State's arguments on this issue. Pp. 21–22.

Vacated and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which GINSBURG, BREYER, KAGAN, and GORSUCH, JJ., joined. ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS and KAVANAUGH, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–532

CLAYVIN HERRERA, PETITIONER *v.* WYOMING

ON WRIT OF CERTIORARI TO THE DISTRICT COURT OF WYOMING, SHERIDAN COUNTY

[May 20, 2019]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

In 1868, the Crow Tribe ceded most of its territory in modern-day Montana and Wyoming to the United States. In exchange, the United States promised that the Crow Tribe "shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon" and "peace subsists . . . on the borders of the hunting districts." Treaty Between the United States of America and the Crow Tribe of Indians (1868 Treaty), Art. IV, May 7, 1868, 15 Stat. 650. Petitioner Clayvin Herrera, a member of the Tribe, invoked this treaty right as a defense against charges of off-season hunting in Bighorn National Forest in Wyoming. The Wyoming courts held that the treaty-protected hunting right expired when Wyoming became a State and, in any event, does not permit hunting in Bighorn National Forest because that land is not "unoccupied." We disagree. The Crow Tribe's hunting right survived Wyoming's statehood, and the lands within Bighorn National Forest did not become categorically "occupied" when set aside as a national reserve.

## I

## A

The Crow Tribe first inhabited modern-day Montana more than three centuries ago. *Montana* v. *United States*, 450 U. S. 544, 547 (1981). The Tribe was nomadic, and its members hunted game for subsistence. J. Medicine Crow, From the Heart of the Crow Country 4–5, 8 (1992). The Bighorn Mountains of southern Montana and northern Wyoming "historically made up both the geographic and the spiritual heart" of the Tribe's territory. Brief for Crow Tribe of Indians as *Amicus Curiae* 5.

The westward migration of non-Indians began a new chapter in the Tribe's history. In 1825, the Tribe signed a treaty of friendship with the United States. Treaty With the Crow Tribe, Aug. 4, 1825, 7 Stat. 266. In 1851, the Federal Government and tribal representatives entered into the Treaty of Fort Laramie, in which the Crow Tribe and other area tribes demarcated their respective lands. *Montana*, 450 U. S., at 547–548. The Treaty of Fort Laramie specified that "the tribes did not 'surrender the privilege of hunting, fishing, or passing over' any of the lands in dispute" by entering the treaty. *Id.,* at 548.

After prospectors struck gold in Idaho and western Montana, a new wave of settlement prompted Congress to initiate further negotiations. See F. Hoxie, Parading Through History 88–90 (1995). Federal negotiators, including Commissioner of Indian Affairs Nathaniel G. Taylor, met with Crow Tribe leaders for this purpose in 1867. Taylor acknowledged that "settlements ha[d] been made" upon the Crow Tribe's lands and that their "game [was] being driven away." Institute for the Development of Indian Law, Proceedings of the Great Peace Commission of 1867–1868, p. 86 (1975) (hereinafter Proceedings). He told the assembled tribal leaders that the United States wished to "set apart a tract of [Crow Tribe] country as a home" for the Tribe "forever" and to buy the rest of

the Tribe's land. *Ibid.* Taylor emphasized that the Tribe would have "the right to hunt upon" the land it ceded to the Federal Government "as long as the game lasts." *Ibid.*

At the convening, Tribe leaders stressed the vital importance of preserving their hunting traditions. See *id.*, at 88 (Black Foot: "You speak of putting us on a reservation and teaching us to farm. . . . That talk does not please us. We want horses to run after the game, and guns and ammunition to kill it. I would like to live just as I have been raised"); *id.*, at 89 (Wolf Bow: "You want me to go on a reservation and farm. I do not want to do that. I was not raised so"). Although Taylor responded that "[t]he game w[ould] soon entirely disappear," he also reassured tribal leaders that they would "still be free to hunt" as they did at the time even after the reservation was created. *Id.*, at 90.

The following spring, the Crow Tribe and the United States entered into the treaty at issue in this case: the 1868 Treaty. 15 Stat. 649. Pursuant to the 1868 Treaty, the Crow Tribe ceded over 30 million acres of territory to the United States. See *Montana*, 450 U. S., at 547–548; Art. II, 15 Stat. 650. The Tribe promised to make its "permanent home" a reservation of about 8 million acres in what is now Montana and to make "no permanent settlement elsewhere." Art. IV, 15 Stat. 650. In exchange, the United States made certain promises to the Tribe, such as agreeing to construct buildings on the reservation, to provide the Tribe members with seeds and implements for farming, and to furnish the Tribe with clothing and other goods. 1868 Treaty, Arts. III–XII, *id.*, at 650–652. Article IV of the 1868 Treaty memorialized Commissioner Taylor's pledge to preserve the Tribe's right to hunt off-reservation, stating:

> "The Indians . . . shall have the right to hunt on the unoccupied lands of the United States so long as game

may be found thereon, and as long as peace subsists among the whites and Indians on the borders of the hunting districts." *Id.*, at 650.

A few months after the 1868 Treaty signing, Congress established the Wyoming Territory. Congress provided that the establishment of this new Territory would not "impair the rights of person or property now pertaining to the Indians in said Territory, so long as such rights shall remain unextinguished by treaty." An Act to Provide a Temporary Government for the Territory of Wyoming (Wyoming Territory Act), July 25, 1868, ch. 235, 15 Stat. 178. Around two decades later, the people of the new Territory adopted a constitution and requested admission to the United States. In 1890, Congress formally admitted Wyoming "into the Union on an equal footing with the original States in all respects," in an Act that did not mention Indian treaty rights. An Act to Provide for the Admission of the State of Wyoming into the Union (Wyoming Statehood Act), July 10, 1890, ch. 664, 26 Stat. 222. Finally, in 1897, President Grover Cleveland set apart an area in Wyoming as a public land reservation and declared the land "reserved from entry or settlement." Presidential Proclamation No. 30, 29 Stat. 909. This area, made up of lands ceded by the Crow Tribe in 1868, became known as the Bighorn National Forest. See App. 234; *Crow Tribe of Indians* v. *Repsis*, 73 F. 3d 982, 985 (CA10 1995).

B

Petitioner Clayvin Herrera is a member of the Crow Tribe who resides on the Crow Reservation in Montana. In 2014, Herrera and other Tribe members pursued a group of elk past the boundary of the reservation and into the neighboring Bighorn National Forest in Wyoming. They shot several bull elk and returned to Montana with the meat. The State of Wyoming charged Herrera for taking elk off-season or without a state hunting license

and with being an accessory to the same.

In state trial court, Herrera asserted that he had a protected right to hunt where and when he did pursuant to the 1868 Treaty. The court disagreed and denied Herrera's pretrial motion to dismiss. See Nos. CT–2015–2687, CT–2015–2688 (4th Jud. Dist. C. C., Sheridan Cty., Wyo., Oct. 16, 2015), App. to Pet. for Cert. 37, 41. Herrera unsuccessfully sought a stay of the trial court's order from the Wyoming Supreme Court and this Court. He then went to trial, where he was not permitted to advance a treaty-based defense, and a jury convicted him on both counts. The trial court imposed a suspended jail sentence, as well as a fine and a 3-year suspension of Herrera's hunting privileges.

Herrera appealed. The central question facing the state appellate court was whether the Crow Tribe's off-reservation hunting right was still valid. The U. S. Court of Appeals for the Tenth Circuit, reviewing the same treaty right in 1995 in *Crow Tribe of Indians* v. *Repsis*, had ruled that the right had expired when Wyoming became a State. 73 F. 3d, at 992–993. The Tenth Circuit's decision in *Repsis* relied heavily on a 19th-century decision of this Court, *Ward* v. *Race Horse*, 163 U. S. 504, 516 (1896). Herrera argued in the state court that this Court's subsequent decision in *Minnesota* v. *Mille Lacs Band of Chippewa Indians*, 526 U. S. 172 (1999), repudiated *Race Horse*, and he urged the Wyoming court to follow *Mille Lacs* instead of the *Repsis* and *Race Horse* decisions that preceded it.

The state appellate court saw things differently. Reasoning that *Mille Lacs* had not overruled *Race Horse*, the court held that the Crow Tribe's 1868 Treaty right expired upon Wyoming's statehood. No. 2016–242 (4th Jud. Dist., Sheridan Cty., Wyo., Apr. 25, 2017), App. to Pet. for Cert. 31–34. Alternatively, the court concluded that the *Repsis* Court's judgment merited issue-preclusive effect against

Herrera because he is a member of the Crow Tribe, and the Tribe had litigated the *Repsis* suit on behalf of itself and its members. App. to Pet. for Cert. 15–17, 31; App. 258. Herrera, in other words, was not allowed to relitigate the validity of the treaty right in his own case.

The court also held that, even if the 1868 Treaty right survived Wyoming's entry into the Union, it did not permit Herrera to hunt in Bighorn National Forest. Again following *Repsis*, the court concluded that the treaty right applies only on "unoccupied" lands and that the national forest became categorically "occupied" when it was created. See App. to Pet. for Cert. 33–34; *Repsis*, 73 F. 3d, at 994. The state appellate court affirmed the trial court's judgment and sentence.

The Wyoming Supreme Court denied a petition for review, and this Court granted certiorari. 585 U. S. ___ (2018). For the reasons that follow, we now vacate and remand.

## II

We first consider whether the Crow Tribe's hunting rights under the 1868 Treaty remain valid. Relying on this Court's decision in *Mille Lacs*, Herrera and the United States contend that those rights did not expire when Wyoming became a State in 1890. We agree.

## A

Wyoming argues that this Court's decision in *Race Horse* establishes that the Crow Tribe's 1868 Treaty right expired at statehood. But this case is controlled by *Mille Lacs*, not *Race Horse*.

*Race Horse* concerned a hunting right guaranteed in a treaty with the Shoshone and Bannock Tribes. The Shoshone-Bannock Treaty and the 1868 Treaty with the Crow Tribe were signed in the same year and contain identical language reserving an off-reservation hunting

right. See Treaty Between the United States of America and the Eastern Band of Shoshonees [*sic*] and the Bannack [*sic*] Tribe of Indians (Shoshone-Bannock Treaty), July 3, 1868, 15 Stat. 674–675 ("[T]hey shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts"). The *Race Horse* Court concluded that Wyoming's admission to the United States extinguished the Shoshone-Bannock Treaty right. 163 U. S., at 505, 514–515.

*Race Horse* relied on two lines of reasoning. The first turned on the doctrine that new States are admitted to the Union on an "equal footing" with existing States. *Id.*, at 511–514 (citing, *e.g.*, *Lessee of Pollard* v. *Hagan*, 3 How. 212 (1845)). This doctrine led the Court to conclude that the Wyoming Statehood Act repealed the Shoshone and Bannock Tribes' hunting rights, because affording the Tribes a protected hunting right lasting after statehood would be "irreconcilably in conflict" with the power— "vested in all other States of the Union" and newly shared by Wyoming—"to regulate the killing of game within their borders." 163 U. S., at 509, 514.

Second, the Court found no evidence in the Shoshone-Bannock Treaty itself that Congress intended the treaty right to continue in "perpetuity." *Id.*, at 514–515. To the contrary, the Court emphasized that Congress "clearly contemplated the disappearance of the conditions" specified in the treaty. *Id.*, at 509. The Court decided that the rights at issue in the Shoshone-Bannock Treaty were "essentially perishable" and afforded the Tribes only a "temporary and precarious" privilege. *Id.*, at 515.

More than a century after *Race Horse* and four years after *Repsis* relied on that decision, however, *Mille Lacs* undercut both pillars of *Race Horse*'s reasoning. *Mille Lacs* considered an 1837 Treaty that guaranteed to several

bands of Chippewa Indians the privilege of hunting, fish-
ing, and gathering in ceded lands "'during the pleasure of
the President.'" 526 U. S., at 177 (quoting 1837 Treaty
With the Chippewa, 7 Stat. 537). In an opinion extensively
discussing and distinguishing *Race Horse*, the Court de-
cided that the treaty rights of the Chippewa bands sur-
vived after Minnesota was admitted to the Union. 526
U. S., at 202–208.

*Mille Lacs* approached the question before it in two
stages. The Court first asked whether the Act admitting
Minnesota to the Union abrogated the treaty right of the
Chippewa bands. Next, the Court examined the Chippewa
Treaty itself for evidence that the parties intended the
treaty right to expire at statehood. These inquires roughly
track the two lines of analysis in *Race Horse*. Despite
these parallel analyses, however, the *Mille Lacs* Court
refused Minnesota's invitation to rely on *Race Horse*,
explaining that the case had "been qualified by later deci-
sions." 526 U. S., at 203. Although *Mille Lacs* stopped
short of explicitly overruling *Race Horse*, it methodically
repudiated that decision's logic.

To begin with, in addressing the effect of the Minnesota
Statehood Act on the Chippewa Treaty right, the *Mille
Lacs* Court entirely rejected the "equal footing" reasoning
applied in *Race Horse*. The earlier case concluded that the
Act admitting Wyoming to the Union on an equal footing
"repeal[ed]" the Shoshone-Bannock Treaty right because
the treaty right was "irreconcilable" with state sovereignty
over natural resources. *Race Horse*, 163 U. S., at 514. But
*Mille Lacs* explained that this conclusion "rested on a false
premise." 526 U. S., at 204. Later decisions showed that
States can impose reasonable and nondiscriminatory
regulations on an Indian tribe's treaty-based hunting,
fishing, and gathering rights on state land when necessary
for conservation. *Id*., at 204–205 (citing *Washington* v.
*Washington State Commercial Passenger Fishing Vessel*

*Assn.*, 443 U. S. 658, 682 (1979); *Antoine* v. *Washington*, 420 U. S. 194, 207–208 (1975); *Puyallup Tribe* v. *Department of Game of Wash.*, 391 U. S. 392, 398 (1968)). "[B]ecause treaty rights are reconcilable with state sovereignty over natural resources," the *Mille Lacs* Court concluded, there is no reason to find statehood itself sufficient "to extinguish Indian treaty rights to hunt, fish, and gather on land within state boundaries." 526 U. S., at 205.

In lieu of adopting the equal-footing analysis, the Court instead drew on numerous decisions issued since *Race Horse* to explain that Congress "must clearly express" any intent to abrogate Indian treaty rights. 526 U. S., at 202 (citing *United States* v. *Dion*, 476 U. S. 734, 738–740 (1986); *Fishing Vessel Assn.*, 443 U. S., at 690; *Menominee Tribe* v. *United States*, 391 U. S. 404, 413 (1968)). The Court found no such "'clear evidence'" in the Act admitting Minnesota to the Union, which was "silent" with regard to Indian treaty rights. 526 U. S., at 203.

The *Mille Lacs* Court then turned to what it referred to as *Race Horse*'s "alternative holding" that the rights in the Shoshone-Bannock Treaty "were not intended to survive Wyoming's statehood." 526 U. S., at 206. The Court observed that *Race Horse* could be read to suggest that treaty rights only survive statehood if the rights are "'"of such a nature as to imply their perpetuity,"'" rather than "'temporary and precarious.'" 526 U. S., at 206. The Court rejected such an approach. The Court found the "'temporary and precarious'" language "too broad to be useful," given that almost any treaty rights—which Congress may unilaterally repudiate, see *Dion*, 476 U. S., at 738—could be described in those terms. 526 U. S., at 206–207. Instead, *Mille Lacs* framed *Race Horse* as inquiring into whether the Senate "intended the rights secured by the . . . Treaty to survive statehood." 526 U. S., at 207. Applying this test, *Mille Lacs* concluded that statehood did not extinguish the Chippewa bands' treaty rights. The

Chippewa Treaty itself defined the specific "circumstances under which the rights would terminate," and there was no suggestion that statehood would satisfy those circumstances. *Ibid.*

Maintaining its focus on the treaty's language, *Mille Lacs* distinguished the Chippewa Treaty before it from the Shoshone-Bannock Treaty at issue in *Race Horse.* Specifically, the Court noted that the Shoshone-Bannock Treaty, unlike the Chippewa Treaty, "tie[d] the duration of the rights to the occurrence of some clearly contemplated event[s]"—*i.e.*, to whenever the hunting grounds would cease to "remai[n] unoccupied and owned by the United States." 526 U. S., at 207. In drawing that distinction, however, the Court took care to emphasize that the treaty termination analysis turns on the events enumerated in the "Treaty itself." *Ibid.* Insofar as the *Race Horse* Court determined that the Shoshone-Bannock Treaty was "impliedly repealed," *Mille Lacs* disavowed that earlier holding. 526 U. S., at 207. "Treaty rights," the Court clarified, "are not impliedly terminated upon statehood." *Ibid.* The Court further explained that "[t]he *Race Horse* Court's decision to the contrary"—that Wyoming's statehood did imply repeal of Indian treaty rights—"was informed by" that Court's erroneous conclusion "that the Indian treaty rights were inconsistent with state sovereignty over natural resources." *Id.*, at 207–208.

In sum, *Mille Lacs* upended both lines of reasoning in *Race Horse.* The case established that the crucial inquiry for treaty termination analysis is whether Congress has expressly abrogated an Indian treaty right or whether a termination point identified in the treaty itself has been satisfied. Statehood is irrelevant to this analysis unless a statehood Act otherwise demonstrates Congress' clear intent to abrogate a treaty, or statehood appears as a termination point in the treaty. See 526 U. S., at 207. "[T]here is nothing inherent in the nature of reserved

treaty rights to suggest that they can be extinguished by *implication* at statehood." *Ibid.*

Even Wyoming concedes that the Court has rejected the equal-footing reasoning in *Race Horse*, Brief for Respondent 26, but the State contends that *Mille Lacs* reaffirmed the alternative holding in *Race Horse* that the Shoshone-Bannock Treaty right (and thus the identically phrased right in the 1868 Treaty with the Crow Tribe) was intended to end at statehood. We are unpersuaded. As explained above, although the decision in *Mille Lacs* did not explicitly say that it was overruling the alternative ground in *Race Horse*, it is impossible to harmonize *Mille Lacs*' analysis with the Court's prior reasoning in *Race Horse*.[1]

We thus formalize what is evident in *Mille Lacs* itself. While *Race Horse* "was not expressly overruled" in *Mille Lacs*, "it must be regarded as retaining no vitality" after that decision. *Limbach* v. *Hooven & Allison Co.*, 466 U. S. 353, 361 (1984). To avoid any future confusion, we make clear today that *Race Horse* is repudiated to the extent it held that treaty rights can be impliedly extinguished at statehood.

B

Because this Court's intervening decision in *Mille Lacs* repudiated the reasoning on which the Tenth Circuit relied in *Repsis*, *Repsis* does not preclude Herrera from arguing that the 1868 Treaty right survived Wyoming's statehood.

Under the doctrine of issue preclusion, "a prior judgment . . . foreclos[es] successive litigation of an issue of

---

[1] Notably, the four Justices who dissented in *Mille Lacs* protested that the Court "effectively overrule[d] *Race Horse sub silentio*." 526 U. S., at 219 (Rehnquist, C. J., dissenting). Others have agreed with this assessment. See, *e.g.*, *State* v. *Buchanan*, 138 Wash. 2d 186, 211–212, 978 P. 2d 1070, 1083 (1999) ("[T]he United States Supreme Court effectively overruled *Race Horse* in *Minnesota* v. *Mille Lacs*").

fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *New Hampshire* v. *Maine*, 532 U. S. 742, 748–749 (2001). Even when the elements of issue preclusion are met, however, an exception may be warranted if there has been an intervening "'change in [the] applicable legal context.'" *Bobby* v. *Bies*, 556 U. S. 825, 834 (2009) (quoting Restatement (Second) of Judgments §28, Comment *c* (1980)); see *Limbach*, 466 U. S., at 363 (refusing to find a party bound by "an early decision based upon a now repudiated legal doctrine"); see also *Montana* v. *United States*, 440 U. S. 147, 155 (1979) (asking "whether controlling facts or legal principles ha[d] changed significantly" since a judgment before giving it preclusive effect); *id.,* at 157–158 (explaining that a prior judgment was conclusive "[a]bsent significant changes in controlling facts or legal principles" since the judgment); *Commissioner* v. *Sunnen*, 333 U. S. 591, 599 (1948) (issue preclusion "is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally"). The change-in-law exception recognizes that applying issue preclusion in changed circumstances may not "advance the equitable administration of the law." *Bobby*, 556 U. S., at 836–837.[2]

——————

[2] The dissent does not disagree outright with this conclusion, noting only that "there is a respectable argument on the other side," *post*, at 12. The dissent argues that the cases cited above are distinguishable, but we do not read them as narrowly as does the dissent. We note, too, that the lower federal courts have long applied the change-in-law exception in a variety of contexts. See, *e.g.*, *Dow Chemical Co.* v. *Nova Chemicals Corp. (Canada)*, 803 F. 3d 620, 627–630 (CA Fed. 2015), cert. denied, 578 U. S. ___ (2016); *Coors Brewing Co.* v. *Mendez-Torres*, 562 F. 3d 3, 11 (CA1 2009), abrogated on other grounds by *Levin* v. *Commerce Energy, Inc.*, 560 U. S. 413 (2010); *Ginters* v. *Frazier*, 614 F. 3d 822, 826–827 (CA8 2010); *Faulkner* v. *National Geographic Enterprises Inc.*, 409 F. 3d 26, 37–38 (CA2 2005); *Chippewa & Flambeau Improvement Co.* v. *FERC*, 325 F. 3d 353, 356–357 (CADC 2003); *Spradling* v.

We conclude that a change in law justifies an exception to preclusion in this case. There is no question that the Tenth Circuit in *Repsis* relied on this Court's binding decision in *Race Horse* to conclude that the 1868 Treaty right terminated upon Wyoming's statehood. See 73 F. 3d, at 994. When the Tenth Circuit reached its decision in *Repsis*, it had no authority to disregard this Court's holding in *Race Horse* and no ability to predict the analysis this Court would adopt in *Mille Lacs*. *Mille Lacs* repudiated *Race Horse*'s reasoning. Although we recognize that it may be difficult at the margins to discern whether a particular legal shift warrants an exception to issue preclusion, this is not a marginal case. At a minimum, a repudiated decision does not retain preclusive force. See *Limbach*, 466 U. S., at 363.[3]

C

We now consider whether, applying *Mille Lacs*, Wyoming's admission to the Union abrogated the Crow Tribe's off-reservation treaty hunting right. It did not.

First, the Wyoming Statehood Act does not show that Congress intended to end the 1868 Treaty hunting right. If Congress seeks to abrogate treaty rights, "it must clearly

_____

*Tulsa*, 198 F. 3d 1219, 1222–1223 (CA10 2000); *Mendelovitz* v. *Adolph Coors Co.*, 693 F. 2d 570, 579 (CA5 1982).

[3] We do not address whether a different outcome would be justified if the State had identified "compelling concerns of repose or reliance." See 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §4425, p. 726 (3d ed. 2016). Wyoming here has not done so. The State suggests that public support for its conservation efforts may be jeopardized if it no longer has "unquestioned" authority over wildlife management in the Bighorn Mountains. Brief for Respondent 54. Wyoming does not explain why its authority to regulate Indians exercising their treaty rights when necessary for conservation is not sufficient to preserve that public support, see *infra*, at 22. The State's passing reference to upsetting the settled expectations of private property owners is unconvincing because the 1868 Treaty right applies only to "unoccupied lands of the United States."

express its intent to do so." *Mille Lacs*, 526 U. S., at 202. "There must be 'clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.'" *Id.*, at 202–203 (quoting *Dion*, 476 U. S., at 740); see *Menominee Tribe*, 391 U. S., at 412. Like the Act discussed in *Mille Lacs*, the Wyoming Statehood Act "makes no mention of Indian treaty rights" and "provides no clue that Congress considered the reserved rights of the [Crow Tribe] and decided to abrogate those rights when it passed the Act." Cf. *Mille Lacs*, 526 U. S., at 203; see Wyoming Statehood Act, 26 Stat. 222. There simply is no evidence that Congress intended to abrogate the 1868 Treaty right through the Wyoming Statehood Act, much less the "'clear evidence'" this Court's precedent requires. *Mille Lacs*, 526 U. S., at 203.[4]

Nor is there any evidence in the treaty itself that Congress intended the hunting right to expire at statehood, or that the Crow Tribe would have understood it to do so. A treaty is "essentially a contract between two sovereign nations." *Fishing Vessel Assn.*, 443 U. S., at 675. Indian treaties "must be interpreted in light of the parties' intentions, with any ambiguities resolved in favor of the Indians," *Mille Lacs*, 526 U. S., at 206, and the words of a treaty must be construed "'in the sense in which they would naturally be understood by the Indians,'" *Fishing Vessel Assn.*, 443 U. S., at 676. If a treaty "itself defines the circumstances under which the rights would terminate," it is to those circumstances that the Court must look to determine if the right ends at statehood. *Mille*

──────────

[4] Recall also that the Act establishing the Wyoming Territory declared that the creation of the Territory would not "impair the rights of person or property now pertaining to the Indians in said Territory" unless a treaty extinguished those rights. Wyoming Territory Act, 15 Stat. 178.

*Lacs*, 526 U. S., at 207.

Just as in *Mille Lacs*, there is no suggestion in the text of the 1868 Treaty with the Crow Tribe that the parties intended the hunting right to expire at statehood. The treaty identifies four situations that would terminate the right: (1) the lands are no longer "unoccupied"; (2) the lands no longer belong to the United States; (3) game can no longer "be found thereon"; and (4) the Tribe and non-Indians are no longer at "peace . . . on the borders of the hunting districts." Art. IV, 15 Stat. 650. Wyoming's statehood does not appear in this list. Nor is there any hint in the treaty that any of these conditions would necessarily be satisfied at statehood. See *Mille Lacs*, 526 U. S., at 207.

The historical record likewise does not support the State's position. See *Choctaw Nation* v. *United States*, 318 U. S. 423, 431–432 (1943) (explaining that courts "may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties" to determine a treaty's meaning). Crow Tribe leaders emphasized the importance of the hunting right in the 1867 negotiations, see, *e.g.*, Proceedings 88, and Commissioner Taylor assured them that the Tribe would have "the right to hunt upon [the ceded land] as long as the game lasts," *id.*, at 86. Yet despite the apparent importance of the hunting right to the negotiations, Wyoming points to no evidence that federal negotiators ever proposed that the right would end at statehood. This silence is especially telling because five States encompassing lands west of the Mississippi River—Nebraska, Nevada, Kansas, Oregon, and Minnesota—had been admitted to the Union in just the preceding decade. See ch. 36, 14 Stat. 391 (Nebraska, Feb. 9, 1867); Presidential Proclamation No. 22, 13 Stat. 749 (Nevada, Oct. 31, 1864); ch. 20, 12 Stat. 126 (Kansas, Jan. 29, 1861); ch. 33, 11 Stat. 383 (Oregon, Feb. 14, 1859); ch. 31, 11 Stat. 285 (Minnesota,

May 11, 1858). Federal negotiators had every reason to bring up statehood if they intended it to extinguish the Tribe's hunting rights.

In the face of this evidence, Wyoming nevertheless contends that the 1868 Treaty expired at statehood pursuant to the *Mille Lacs* analysis. Wyoming does not argue that the legal act of Wyoming's statehood abrogated the treaty right, and it cannot contend that statehood is explicitly identified as a treaty expiration point. Instead, Wyoming draws on historical sources to assert that statehood, as a practical matter, marked the arrival of "civilization" in the Wyoming Territory and thus rendered all the lands in the State occupied. Brief for Respondent 48. This claim cannot be squared with *Mille Lacs*.

Wyoming's arguments boil down to an attempt to read the treaty impliedly to terminate at statehood, precisely as *Mille Lacs* forbids. The State sets out a potpourri of evidence that it claims shows statehood in 1890 effectively coincided with the disappearance of the wild frontier: for instance, that the buffalo were extinct by the mid-1870s; that by 1880, Indian Department regulations instructed Indian agents to confine tribal members "'wholly within the limits of their respective reservations'"; and that the Crow Tribe stopped hunting off-reservation altogether in 1886. Brief for Respondent 47 (quoting §237 Instructions to Indian Agents (1880), as published in Regulations of the Indian Dept. §492 (1884)).

Herrera contradicts this account, see Reply Brief for Petitioner 5, n. 3, and the historical record is by no means clear. For instance, game appears to have persisted for longer than Wyoming suggests. See Dept. of Interior, Ann. Rep. of the Comm'r of Indian Affairs 495 (1873) (Black Foot: "On the other side of the river below, there are plenty of buffalo; on the mountains are plenty of elk and black-tail deer; and white-tail deer are plenty at the foot of the mountain"). As for the Indian Department

Regulations, there are reports that a group of Crow Tribe members "regularly hunted along the Little Bighorn River" even after the regulation the State cites was in effect. Hoxie, Parading Through History, at 26. In 1889, the Office of Indian Affairs wrote to U. S. Indian Agents in the Northwest that "[f]requent complaints have been made to this Department that Indians are in the habit of leaving their reservations for the purpose of hunting." 28 Cong. Rec. 6231 (1896).

Even assuming that Wyoming presents an accurate historical picture, the State's mode of analysis is severely flawed. By using statehood as a proxy for occupation, Wyoming subverts this Court's clear instruction that treaty-protected rights "are not impliedly terminated upon statehood." *Mille Lacs*, 526 U. S., at 207.

Finally, to the extent that Wyoming seeks to rely on this same evidence to establish that all land in Wyoming was functionally "occupied" by 1890, its arguments fall outside the question presented and are unpersuasive in any event. As explained below, the Crow Tribe would have understood occupation to denote some form of residence or settlement. See *infra*, at 19–20. Furthermore, Wyoming cannot rely on *Race Horse* to equate occupation with statehood, because that case's reasoning rested on the flawed belief that statehood could not coexist with a continuing treaty right. See *Race Horse*, 163 U. S., at 514; *Mille Lacs*, 526 U. S., at 207–208.

Applying *Mille Lacs*, this is not a hard case. The Wyoming Statehood Act did not abrogate the Crow Tribe's hunting right, nor did the 1868 Treaty expire of its own accord at that time. The treaty itself defines the circumstances in which the right will expire. Statehood is not one of them.

## III

We turn next to the question whether the 1868 Treaty

right, even if still valid after Wyoming's statehood, does
not protect hunting in Bighorn National Forest because
the forest lands are "occupied." We agree with Herrera
and the United States that Bighorn National Forest did
not become categorically "occupied" within the meaning of
the 1868 Treaty when the national forest was created.[5]

—————

[5] Wyoming argues that the judgment below should be affirmed be-
cause the Tenth Circuit held in *Repsis* that the creation of the forest
rendered the land "occupied," see 73 F. 3d, at 994, and thus Herrera is
precluded from raising this issue. We did not grant certiorari on the
question of how preclusion principles would apply to the alternative
judgment in *Repsis*, and—although our dissenting colleagues disagree,
see *post*, at 13, and n. 6—the decision below did not address that issue.

The Wyoming appellate court agreed with the State that "the pri-
mary issue in [Herrera's] case is identical to the *primary issue* in the
*Repsis* case." No. 2016–242 (4th Jud. Dist., Sheridan Cty., Wyo., Apr.
25, 2017), App. to Pet. for Cert. 13 (emphasis added). That "primary
issue" was the *Race Horse* ground of decision, not the "occupation"
ground, which *Repsis* referred to as "an alternative basis for affir-
mance," *Repsis*, 73 F. 3d, at 993, and which the Wyoming court itself
described as an "alternativ[e]" holding, No. 2016–242, App. to Pet. for
Cert. 33. Reading the state court's decision to give preclusive effect to
the occupation ground as well would not fit with the Wyoming court's
preclusion analysis, which, among other things, relied on a decision of
the Federal District Court in *Repsis* that did not address the occupation
issue. See No. 2016–242, App. to Pet. for Cert. 14, 18; see also *Repsis*,
73 F. 3d, at 993 (explaining that "the district court did not reach [the
occupation] issue"). Context thus makes clear that the state court gave
issue-preclusive effect only to *Repsis*' holding that the 1868 Treaty was
no longer valid, not to *Repsis*' independent, narrower holding that
Bighorn National Forest in particular was "occupied" land. The court
may not have addressed the issue-preclusive effect of the latter holding
because of ambiguity in the State's briefing. See Appellee's Supple-
mental Brief in No. 2016–242, pp. 4, 11–12.

While the dissent questions whether forfeiture could have played a
part in the state court's analysis given that the court invited the parties
to submit supplemental briefs on preclusion, *post*, at 13, n. 6, the
parties suggest that Wyoming failed adequately to raise the claim even
in its supplemental brief. See Brief for Petitioner 49 ("the state made
no such argument before" the state court); Brief for United States as
*Amicus Curiae* 31 (noting ambiguity in the State's supplemental brief).

Treaty analysis begins with the text, and treaty terms are construed as "'they would naturally be understood by the Indians.'" *Fishing Vessel Assn.*, 443 U. S., at 676. Here it is clear that the Crow Tribe would have understood the word "unoccupied" to denote an area free of residence or settlement by non-Indians.

That interpretation follows first and foremost from several cues in the treaty's text. For example, Article IV of the 1868 Treaty made the hunting right contingent on peace "among the whites and Indians on the borders of the hunting districts," thus contrasting the unoccupied hunting districts with areas of white settlement. 15 Stat. 650. The treaty elsewhere used the word "occupation" to refer to the Tribe's residence inside the reservation boundaries, and referred to the Tribe members as "settlers" on the new reservation. Arts. II, VI, *id.,* at 650–651. The treaty also juxtaposed occupation and settlement by stating that the Tribe was to make "no permanent settlement" other than on the new reservation, but could hunt on the "unoccupied lands" of the United States. Art. IV, *id.,* at 650. Contemporaneous definitions further support a link between occupation and settlement. See W. Anderson, A Diction-

---

It can be "appropriate in special circumstances" for a court to address a preclusion argument *sua sponte*. *Arizona* v. *California*, 530 U. S. 392, 412 (2000). But because the Wyoming District Court "did not address" this contention, "we decline to address it here." *County of Los Angeles* v. *Mendez*, 581 U. S. \_\_\_, \_\_\_, n. (2017) (slip op., at 8, n.); see *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005); *Archer* v. *Warner*, 538 U. S. 314, 322–323 (2003). Resolution of this question would require fact-intensive analyses of whether this issue was fully and fairly litigated in *Repsis* or was forfeited in this litigation, among other matters. These gateway issues should be decided before this Court addresses them, especially given that even the dissent acknowledges that one of the preclusion issues raised by the parties is important and undecided, *post*, at 14, and some of the parties' other arguments are equally weighty. Unlike the dissent, we do not address these issues in the first instance.

ary of Law 725 (1889) (defining "occupy" as "[t]o hold in possession; to hold or keep for use" and noting that the word "[i]mplies actual use, possession or cultivation by a particular person"); *id.,* at 944 (defining "settle" as "[t]o establish one's self upon; to occupy, reside upon").

Historical evidence confirms this reading of the word "unoccupied." At the treaty negotiations, Commissioner Taylor commented that "settlements ha[d] been made upon [Crow Tribe] lands" and that "white people [were] rapidly increasing and . . . occupying all the valuable lands." Proceedings 86. It was against this backdrop of white settlement that the United States proposed to buy "the right to use and settle" the ceded lands, retaining for the Tribe the right to hunt. *Ibid.* A few years after the 1868 Treaty signing, a leader of the Board of Indian Commissioners confirmed the connection between occupation and settlement, explaining that the 1868 Treaty permitted the Crow Tribe to hunt in an area "as long as there are any buffalo, and as long as the white men are not [in that area] with farms." Dept. of Interior, Ann. Rep. of the Comm'r of Indian Affairs 500.

Given the tie between the term "unoccupied" and a lack of non-Indian settlement, it is clear that President Cleveland's proclamation creating Bighorn National Forest did not "occupy" that area within the treaty's meaning. To the contrary, the President "reserved" the lands "from entry or settlement." Presidential Proclamation No. 30, 29 Stat. 909. The proclamation gave "[w]arning . . . to all persons not to enter or make settlement upon the tract of land reserved by th[e] proclamation." *Id.,* at 910. If anything, this reservation made Bighorn National Forest more hospitable, not less, to the Crow Tribe's exercise of the 1868 Treaty right.

Wyoming's counterarguments are unavailing. The State first asserts that the forest became occupied through the Federal Government's "exercise of dominion and control"

over the forest territory, including federal regulation of those lands. Brief for Respondent 56–60. But as explained, the treaty's text and the historical record suggest that the phrase "unoccupied lands" had a specific meaning to the Crow Tribe: lack of settlement. The proclamation of a forest reserve withdrawing land from settlement would not categorically transform the territory into an area resided on or settled by non-Indians; quite the opposite. Nor would the restrictions on hunting in national forests that Wyoming cites. See Appropriations Act of 1899, ch. 424, 30 Stat. 1095; 36 CFR §§241.2, 241.3 (Supp. 1941); §261.10(d)(1) (2018).

Wyoming also claims that exploitative mining and logging of the forest lands prior to 1897 would have caused the Crow Tribe to view the Bighorn Mountains as occupied. But the presence of mining and logging operations did not amount to settlement of the sort that the Tribe would have understood as rendering the forest occupied. In fact, the historical source on which Wyoming primarily relies indicates that there was "very little" settlement of Bighorn National Forest around the time the forest was created. Dept. of Interior, Nineteenth Ann. Rep. of the U. S. Geological Survey 167 (1898).

Considering the terms of the 1868 Treaty as they would have been understood by the Crow Tribe, we conclude that the creation of Bighorn National Forest did not remove the forest lands, in their entirety, from the scope of the treaty.

## IV

Finally, we note two ways in which our decision is limited. First, we hold that Bighorn National Forest is not categorically occupied, not that all areas within the forest are unoccupied. On remand, the State may argue that the specific site where Herrera hunted elk was used in such a way that it was "occupied" within the meaning of the 1868 Treaty. See *State* v. *Cutler*, 109 Idaho 448, 451, 708 P. 2d

853, 856 (1985) (stating that the Federal Government may not be foreclosed from using land in such a way that the Indians would have considered it occupied).

Second, the state trial court decided that Wyoming could regulate the exercise of the 1868 Treaty right "in the interest of conservation." Nos. CT–2015–2687, CT–2015–2688, App. to Pet. for Cert. 39–41; see *Antoine*, 420 U. S., at 207. The appellate court did not reach this issue. No. 2016–242, App. to Pet. for Cert. 14, n. 3. On remand, the State may press its arguments as to why the application of state conservation regulations to Crow Tribe members exercising the 1868 Treaty right is necessary for conservation. We do not pass on the viability of those arguments today.

*        *        *

The judgment of the Wyoming District Court of the Fourth Judicial District, Sheridan County, is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–532

_____

## CLAYVIN HERRERA, PETITIONER *v.* WYOMING

ON WRIT OF CERTIORARI TO THE DISTRICT COURT OF
WYOMING, SHERIDAN COUNTY

[May 20, 2019]

JUSTICE ALITO, with whom THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE KAVANAUGH join, dissenting.

The Court's opinion in this case takes a puzzling course. The Court holds that members of the Crow Tribe retain a virtually unqualified right under the Treaty Between the United States of America and the Crow Tribe of Indians (1868 Treaty) to hunt on land that is now part of the Bighorn National Forest. This interpretation of the treaty is debatable and is plainly contrary to the decision in *Ward* v. *Race Horse*, 163 U. S. 504 (1896), which construed identical language in a closely related treaty. But even if the Court's interpretation of the treaty is correct, its decision will have no effect if the members of the Crow Tribe are bound under the doctrine of issue preclusion by the judgment in *Crow Tribe of Indians* v. *Repsis*, 73 F. 3d 982, 992–993 (CA10 1995) (holding that the hunting right conferred by that treaty is no longer in force).

That judgment was based on two independent grounds, and the Court deals with only one of them. The Court holds that the first ground no longer provides an adequate reason to give the judgment preclusive effect due to an intervening change in the legal context. But the Court sidesteps the second ground and thus leaves it up to the state courts to decide whether the *Repsis* judgment continues to have binding effect. If it is still binding—and I think it is—then no member of the Tribe will be able

to assert the hunting right that the Court addresses. Thus, the Court's decision to plow ahead on the treaty-interpretation issue is hard to understand, and its discourse on that issue is likely, in the end, to be so much wasted ink.

I

A

As the Court notes, the Crow Indians eventually settled in what is now Montana, where they subsequently came into contact with early white explorers and trappers. F. Hoxie, The Crow 26–28, 33 (1989). In an effort to promote peace between Indians and white settlers and to mitigate conflicts between different tribes, the United States negotiated treaties that marked out a territory for each tribe to use as a hunting district. See 2 C. Kappler, Indian Affairs: Laws and Treaties 594 (2d ed. 1904) (Kappler). The Treaty of Fort Laramie of 1851 (1851 Treaty), 11 Stat. 749, created such a hunting district for the Crow.

As white settlement increased, the United States entered into a series of treaties establishing reservations for the Crow and neighboring tribes, and the 1868 Treaty was one such treaty. 15 Stat. 649; Kappler 1008. It set out an 8-million-acre reservation for the Crow Tribe but required the Tribe to cede ownership of all land outside this reservation, including 30 million acres that lay within the hunting district defined by the 1851 Treaty. Under this treaty, however, the Crow kept certain enumerated rights with respect to the use of those lands, and among these was "the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and as long as peace subsists among the whites and Indians on the borders of the hunting districts." 1868 Treaty, Art. IV, 15 Stat. 650.

Shortly after the signing of the 1868 Treaty, Congress created the Wyoming Territory, which was adjacent to and

immediately south of the Crow Tribe's reservation. The Act creating the Territory provided that "nothing in this act shall be construed to impair the rights of person or property now pertaining to the Indians in said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians." Act of July 25, 1868, ch. 235, 15 Stat. 178. Twenty-two years later, Congress admitted Wyoming as a State "on an equal footing with the original States in all respects whatever." Act of July 10, 1890, ch. 664, 26 Stat. 222. The following year, Congress passed an Act empowering the President to "set apart and reserve" tracts of public lands owned by the United States as forest reservations. Act of Mar. 3, 1891, ch. 561, §24, 26 Stat. 1103. Exercising that authority, President Cleveland designated some lands in Wyoming that remained under federal ownership as a forest reservation. Presidential Proclamation No. 30, 29 Stat. 909. Today, those lands make up the Bighorn National Forest. Bighorn abuts the Crow Reservation along the border between Wyoming and Montana and includes land that was previously part of the Crow Tribe's hunting district.

These enactments did not end legal conflicts between the white settlers and Indians. Almost immediately after Wyoming's admission to the Union, this Court had to determine the extent of the State's regulatory power in light of a tribe's reserved hunting rights. A member of the Shoshone-Bannock Tribes named Race Horse had been arrested by Wyoming officials for taking elk in violation of state hunting laws. *Race Horse*, *supra,* at 506. The Shoshone-Bannock Tribes, like the Crow, had accepted a reservation while retaining the right to hunt in the lands previously within their hunting district. Their treaty reserves the same right, using the same language, as the Crow Tribe's treaty.[1] Race Horse argued that he had the

—————

[1] The Shoshone-Bannock Treaty reserved "'the right to hunt on the

right to hunt at the spot of his alleged offense, as the nearest settlement lay more than 60-miles distant, making the land where he was hunting "unoccupied lands of the United States." *In re Race Horse*, 70 F. 598, 599–600 (Wyo. 1895).

This Court rejected Race Horse's argument, holding that the admission of Wyoming to the Union terminated the hunting right. 163 U. S., at 514. Although the opinion of the Court is not a model of clarity, this conclusion appears to rest on two grounds.

First, the Court held that Wyoming's admission necessarily ended the Tribe's hunting right because otherwise the State would lack the power, possessed by every other State, "to regulate the killing of game within [its] borders." *Ibid.* Limiting Wyoming's power in this way, the Court reasoned, would contravene the equal-footing doctrine, which dictates that all States enter the Union with the full panoply of powers enjoyed by the original 13 States at the adoption of the Constitution. *Ibid.* Under this rationale, the Act of Congress admitting Wyoming could not have preserved the hunting right even if that had been Congress's wish.

After providing this basis for its holding, however, the Court quickly turned to a second ground, namely, that even if Congress could have limited Wyoming's authority in this way, it had not attempted to do so. *Id.*, at 515. The Court thought that Congress's intention not to impose such a restriction on the State was "conveyed by the express terms of the act of admission," but the Court did not identify the terms to which it was referring. *Ibid.* It did, however, see support for its decision in the nature of the

––––––––––

unoccupied lands of the United States, so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts.'" *Race Horse*, 163 U. S., at 507; Kappler 1020, 1021.

hunting right reserved under the treaty. This right, the Court observed, was not "of such a nature as to imply [its] perpetuity" but was instead "temporary and precarious," since it depended on the continuation of several conditions, including at least one condition wholly within the control of the Government—continued federal ownership of the land. *Ibid.*

*Race Horse* did not mark a final resolution of the conflict between Wyoming's regulatory power and tribal hunting rights. Nearly a century later, Thomas Ten Bear, a member of the Crow Tribe, crossed into Wyoming to hunt elk in the Bighorn National Forest, just as Herrera did in this case. Wyoming game officials cited Ten Bear, and he was ultimately convicted of hunting elk without the requisite license.[2] Ten Bear, like Race Horse before him, filed a lawsuit in federal court disputing Wyoming's authority to regulate hunting by members of his Tribe. *Crow Tribe of Indians* v. *Repsis*, 866 F. Supp. 520, 521 (Wyo. 1994). Joined by the Crow Tribe, he argued that the 1868 Treaty— the same treaty at issue here—gave him the right to take elk in the national forest.

The District Court found that challenge indistinguishable from the one addressed in *Race Horse*. The District Court noted that Race Horse had pointed to "identical treaty language" and had "advanced the identical contention now made by" Ten Bear and the Tribe. *Repsis*, 866 F. Supp., at 522. Because *Race Horse* "remain[ed] controlling," the District Court granted summary judgment to the State. 866 F. Supp., at 524.

The Tenth Circuit affirmed that judgment on two independent grounds. First, the Tenth Circuit agreed with the

———————

[2] Wyoming officials enforce the State's hunting laws on national forest lands pursuant to a memorandum of understanding between the State and Federal Governments. *Crow Tribe of Indians* v. *Repsis*, 866 F. Supp. 520, 521, n. 1 (Wyo. 1994).

District Court that, under *Race Horse*, "[t]he Tribe's right to hunt reserved in the Treaty with the Crows, 1868, was repealed by the act admitting Wyoming into the Union." *Crow Tribe of Indians* v. *Repsis*, 73 F. 3d 982, 992 (1995). Second, as an independent alternative ground for affirmance, the Tenth Circuit held that the Tribe's hunting right had expired because "the treaty reserved an off-reservation hunting right on 'unoccupied' lands and the lands of the Big Horn National Forest are 'occupied.'" *Id.*, at 993. The Tenth Circuit reasoned that "unoccupied" land within the meaning of the treaty meant land that was open for commercial or residential use, and since the creation of the national forest precluded those activities, it followed that the land was no longer "unoccupied" in the relevant sense. *Ibid.*

## B

The events giving rise to the present case are essentially the same as those in *Race Horse* and *Repsis*. During the winter of 2013, Herrera, who was an officer in the Crow Tribe's fish and game department, contacted Wyoming game officials to offer assistance investigating a number of poaching incidents along the border between Bighorn and the Crow Reservation.[3] After a lengthy discussion in which Herrera asked detailed questions about the State's investigative capabilities, the Wyoming officials became suspicious of Herrera's motives. The officials conducted a web search for Herrera's name and found photographs posted on trophy-hunting and social media websites that showed him posing with bull elk. The officers recognized from the scenery in the pictures that the elk had been

---

[3] Such cooperative law enforcement is valuable because the Crow Reservation and Bighorn National Forest face one another along the border between Montana, where the Crow Reservation is located, and Wyoming, where Bighorn is located. *Supra*, at 3. The border is delineated by a high fence intermittently posted with markers.

killed in Bighorn and were able to locate the sites where the pictures had been taken. At those sites, about a mile south of the fence running along the Bighorn National Forest boundary, state officials discovered elk carcasses. The heads had been taken from the carcasses but much of the meat was abandoned in the field. State officials confronted Herrera, who confessed to the shootings and turned over the heads that he and his companions had taken as trophies. The Wyoming officials cited Herrera for hunting out of season.

Herrera moved to dismiss the citations, arguing that he had a treaty right to hunt in Bighorn. The trial court rejected this argument, concluding that it was foreclosed by the Tenth Circuit's analysis in *Repsis,* and the jury found Herrera guilty. On appeal, Herrera continued to argue that he had a treaty right to hunt in Bighorn. The appellate court held that the judgment in *Repsis* precluded him from asserting a treaty hunting right, and it also held, in the alternative, that Herrera's treaty rights did not allow him to hunt in Bighorn. This Court granted certiorari.

## II

In seeking review in this Court, Herrera framed this case as implicating only a question of treaty interpretation. But unless the state court was wrong in holding that Herrera is bound by the judgment in *Repsis*, there is no reason to reach the treaty-interpretation question. For this reason, I would begin with the question of issue preclusion, and because I believe that Herrera is bound by the adverse decision on that issue in *Repsis*, I would not reach the treaty-interpretation issue.

## A

It is "a fundamental precept of common-law adjudication" that "an issue once determined by a competent court

is conclusive." *Arizona* v. *California*, 460 U. S. 605, 619
(1983). "The idea is straightforward: Once a court has
decided an issue, it is forever settled as between the par-
ties, thereby protecting against the expense and vexation
attending multiple lawsuits, conserving judicial resources,
and fostering reliance on judicial action by minimizing the
possibility of inconsistent verdicts." *B&B Hardware, Inc.*
v. *Hargis Industries, Inc.*, 575 U. S. 138, ___ (2015) (slip
op., at 8) (internal quotation marks, citation, and altera-
tions omitted). Succinctly put, "a losing litigant deserves
no rematch after a defeat fairly suffered." *Astoria Fed.
Sav. & Loan Assn.* v. *Solimino*, 501 U. S. 104, 107 (1991).

Under federal issue-preclusion principles,[4] "once an
issue is actually and necessarily determined by a court of
competent jurisdiction, that determination is conclusive in
subsequent suits based on a different cause of action
involving a party to the prior litigation." *Montana* v.
*United States*, 440 U. S. 147, 153 (1979). That standard
for issue preclusion is met here.

In *Repsis*, the central issue—and the question on which
the Crow Tribe sought a declaratory judgment—was
whether members of the Tribe "have an unrestricted right
to hunt and fish on Big Horn National Forest lands." 866
F. Supp., at 521. The Tenth Circuit's judgment settled
that question by holding that "the Tribe and its members
are subject to the game laws of Wyoming." 73 F. 3d, at
994. In this case, Herrera asserts the same hunting right
that was actually litigated and decided against his Tribe
in *Repsis*. He does not suggest that either the Federal
District Court or the Tenth Circuit lacked jurisdiction to

—————

[4] The preclusive effect of the judgment of a federal court is governed
by federal law, regardless of whether that judgment's preclusive effect
is later asserted in a state or federal forum. *Taylor* v. *Sturgell*, 553
U. S. 880, 892 (2008). This means that the preclusive effect of *Repsis*,
decided by a federal court, is governed by federal law, not Wyoming
law, even though preclusion was asserted in a Wyoming court.

decide *Repsis*. And, because Herrera's asserted right is based on his membership in the Tribe, a judgment binding on the Tribe is also binding on him. As a result, the Wyoming appellate court held that *Repsis* bound Herrera and precluded him from asserting a treaty-rights defense. That holding was correct.

## B

The majority concludes otherwise based on an exception to issue preclusion that applies when there has been an intervening "change in the applicable legal context." *Ante*, at 12 (internal quotation marks and alteration omitted). Specifically, the majority reasons that the *Repsis* judgment was based on *Race Horse* and that our subsequent decision in *Minnesota* v. *Mille Lacs Band of Chippewa Indians*, 526 U. S. 172 (1999), represents a change in the applicable law that is sufficient to abrogate the *Repsis* judgment's preclusive effect. There is support in the Restatement (Second) of Judgments for the general proposition that a change in law may alter a judgment's preclusive effect, §28, Comment *c*, p. 276 (1980), and in a prior case, *Bobby* v. *Bies*, 556 U. S. 825, 834 (2009), we invoked that provision. But we have never actually held that a prior judgment lacked preclusive effect on this ground. Nor have we ever defined how much the relevant "legal context" must change in order for the exception to apply. If the exception is applied too aggressively, it could dangerously undermine the important interests served by issue preclusion. So caution is in order in relying on that exception here.

The majority thinks that the exception applies because *Mille Lacs* effectively overruled *Race Horse*, even though it did not say that in so many words. But that is a questionable interpretation. The fact of the matter is that the *Mille Lacs* majority held back from actually overruling *Race Horse*, even though the dissent claimed that it had

effectively done so. See *Mille Lacs*, 526 U. S., at 207 (applying the "*Race Horse* inquiry" but factually distinguishing that case from the facts present in *Mille Lacs*); *id.*, at 219 (Rehnquist, C. J., dissenting) (noting the Court's "apparent overruling *sub silentio*" of *Race Horse*). And while the opinion of the Court repudiated one of the two grounds that the *Race Horse* Court gave for its decision (the equal-footing doctrine), it is by no means clear that *Mille Lacs* also rejected the second ground (the conclusion that the terms of the Act admitting Wyoming to the Union manifested a congressional intent not to burden the State with the right created by the 1868 Treaty). With respect to this latter ground, the *Mille Lacs* Court characterized the proper inquiry as follows: "whether Congress (more precisely, because this is a treaty, the Senate) intended the rights secured by the 1837 Treaty to survive statehood." 526 U. S., at 207. And the Court then went on to analyze the terms of the particular treaty at issue in that case and to contrast those terms with those of the treaty in *Race Horse*. *Mille Lacs*, *supra*, at 207.

On this reading, it appears that *Mille Lacs* did not reject the second ground for the decision in *Race Horse* but simply found it inapplicable to the facts of the case at hand. I do not claim that this reading of *Mille Lacs* is indisputable, but it is certainly reasonable, and if it is correct, *Mille Lacs* did not change the legal context as much as the majority suggests. It knocked out some of *Race Horse*'s reasoning but did not effectively overrule the decision. Is that enough to eliminate the preclusive effect of the first ground for the *Repsis* judgment?

The majority cites no authority holding that a decision like *Mille Lacs* is sufficient to deprive a prior judgment of its issue-preclusive effect. Certainly, *Bies, supra*, upon which the majority relies, is not such authority. In that case, Bies had been convicted of murder and sentenced to death at a time when what was then termed "mental

retardation" did not render a defendant ineligible for a death sentence but was treated as simply a mitigating factor to be taken into account in weighing whether such a sentence should be imposed. When Bies contested his death sentence on appeal, the state appellate court observed that he suffered from a mild form of intellectual disability, but it nevertheless affirmed his sentence. Years later, in *Atkins* v. *Virginia*, 536 U. S. 304 (2002), this Court ruled that an intellectually disabled individual cannot be executed, and the Sixth Circuit then held that the state court's prior statements about Bies's condition barred his execution under issue-preclusion principles.

This Court reversed, and its primary reason for doing so has no relation to the question presented here. We found that issue preclusion was not available to Bies because he had not prevailed in the first action; despite the state court's recognition of mild intellectual disability as a mitigating factor, it had affirmed his sentence. As we put it, "[i]ssue preclusion . . . does not transform final judgment losers . . . into partially prevailing parties." *Bies*, 556 U. S., at 829; see also *id.*, at 835.

Only after providing this dispositive reason for rejecting the Sixth Circuit's invocation of issue preclusion did we go on to cite the Restatement's discussion of the change-in-law exception. And we then quickly noted that the issue addressed by the state appellate courts prior to *Atkins* ("[m]ental retardation as a mitigator") was not even the same issue as the issue later addressed after *Atkins*. *Bies, supra,* at 836 (the two "are discrete legal issues"). So *Bies* is very far afield.[5]

————————
[5] Nor are the other cases cited by the majority more helpful to the Court's position. *Commissioner* v. *Sunnen*, 333 U. S. 591 (1948), and *Limbach* v. *Hooven & Allison Co.*, 466 U. S. 353 (1984)—and, indeed, *Montana* v. *United States*, 440 U. S. 147 (1979)—are tax cases that hold, consistent with the general policy against "discriminatory distinctions in tax liability," *Sunnen*, 333 U. S., at 599, that issue preclusion

Although the majority in the present case believes that *Mille Lacs* unquestionably constitutes a sufficient change in the legal context, see *ante*, at 13, there is a respectable argument on the other side. I would not decide that question because Herrera and other members of the Crow Tribe are bound by the judgment in *Repsis* even if the change-in-legal-context exception applies.

C

That is so because the *Repsis* judgment was based on a second, independently sufficient ground that has nothing to do with *Race Horse*, namely, that the Bighorn National Forest is not "unoccupied." Herrera and the United States, appearing as an *amicus* in his support, try to escape the effect of this alternative ground based on other exceptions to the general rule of issue preclusion. But accepting any of those exceptions would work a substantial change in established principles, and it is fortunate that the majority has not taken that route.

Unfortunately, the track that the majority has chosen is no solution because today's decision will not prevent the Wyoming courts on remand in this case or in future cases presenting the same issue from holding that the *Repsis* judgment binds all members of the Crow Tribe who hunt within the Bighorn National Forest. And for the reasons I will explain, such a holding would be correct.

1

Attempting to justify its approach, the majority claims that the decision below gave preclusive effect to only the

––––––––––

has limited application when the conduct in the second litigation occurred in a different tax year than the conduct that was the subject of the earlier judgment. We have not, prior to today, applied *Sunnen*'s tax-specific policy in cases that do not involve tax liability and do not create a possibility of "inequalities in the administration of the revenue laws." *Ibid.*

first ground adopted by the Tenth Circuit in *Repsis*—that is, the ground that relied on *Race Horse*. *Ante*, at 18, n. 5. But nowhere in the decision below can any such limitation be found. The Wyoming appellate court discussed the second ground for the *Repsis* judgment, see App. to Pet. for Cert. 22 ("[T]he creation of the Big Horn National Forest resulted in the 'occupation' of the land, extinguishing the off-reservation hunting right"), and it concluded that *the judgment* in *Repsis*, not just one of the grounds for that judgment, "preclude[s] Herrera from attempting to relitigate the validity of the off-reservation hunting right that was previously held to be invalid," App. to Pet. for Cert. 31.[6]

2

Herrera takes a different approach in attempting to circumvent the effect of the alternative *Repsis* ground. When a judgment rests on two independently sufficient

---

[6]The decision below, in other words, held that the issue that was precluded was whether members of the Crow Tribe have a treaty right to hunt in Bighorn. The majority rejects this definition of the issue, and instead asks only whether the first line of reasoning in *Repsis* retains preclusive effect. Such hairsplitting conflicts with the fundamental purpose of issue preclusion—laying legal disputes at rest. If courts allow a party to escape preclusion whenever a decision on one legal question can be divided into multiple or alternate parts, the doctrine of preclusion would lose its value. The majority's "[n]arrower definition of the issues resolved augments the risk of apparently inconsistent results" and undermines the objectives of finality and economy served by preclusion. 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §4417, p. 470 (3d ed. 2016).

The Court also hints that the state court might have thought that Wyoming forfeited reliance on issue preclusion, *ante*, at 18, n. 5, but there is no basis for that suggestion. The Wyoming appellate court invited the parties to submit supplemental briefs on issue preclusion and specifically held that "it [was] proper for the Court to raise this issue *sua sponte* when no factual development is required, and the parties are given an opportunity to fully brief the issues." App. to Pet. for Cert. 10, n. 2.

grounds, he contends, neither ground should be regarded as having an issue-preclusive effect. This argument raises an important question that this Court has never decided and one on which the First and Second Restatements of Judgments take differing views. According to the First Restatement, a judgment based on alternative grounds "is determinative on both grounds, although either alone would have been sufficient to support the judgment." Restatement of Judgments §68, Comment *n* (1942). Other authorities agree. See 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §4421, p. 613 (3d ed. 2016) (noting "substantial support in federal decisions" for this approach).[7] But the Second Restatement reversed this view, recommending that a judgment based on the determination of two independent issues "is not conclusive with respect to either issue standing alone." §27, Comment *i*, at 259.

There is scant explanation for this change in position beyond a reference in the Reporter's Note to a single decision of the United States Court of Appeals for the Second Circuit. *Id.*, Reporter's Note, Comment *i*, at 270 (discussing *Halpern* v. *Schwartz*, 426 F. 2d 102 (1970)). But even that court has subsequently explained that *Halpern* was "not intended to have . . . broad impact outside the [bankruptcy] context," and it continues to follow the rule of the First Restatement "in circumstances divergent from those in *Halpern*." *Winters* v. *Lavine*, 574 F. 2d 46, 67 (1978). It thus appears that in this portion of the Second Restatement, the Reporters adopted a prescriptive rather than a descriptive approach. In such situations, the Restatement loses much of its value. See *Kansas* v. *Nebraska*, 574 U. S.

--------

[7] See, *e.g., Jean Alexander Cosmetics, Inc.* v. *L'Oreal USA, Inc.*, 458 F. 3d 244, 251–257 (CA3 2006) (collecting cases); *In re Westgate-California Corp.*, 642 F. 2d 1174, 1176–1177 (CA9 1981); *Winters* v. *Lavine*, 574 F. 2d 46, 66–67 (CA2 1978); *Irving Nat'l Bank* v. *Law*, 10 F. 2d 721, 724 (CA2 1926) (Hand, J.).

445, 475 (2015) (Scalia, J., concurring in part and dissenting in part).

The First Restatement has the more compelling position. There appear to be two principal objections to giving alternative grounds preclusive effect. The first is that the court rendering the judgment may not have given each of the grounds "the careful deliberation and analysis normally applied to essential issues." *Halpern*, *supra*, at 105. This argument is based on an unjustified assessment of the way in which courts do their work. Even when a court bases its decision on multiple grounds, "it is reasonable to expect that such a finding is the product of careful judicial reasoning." *Jean Alexander Cosmetics, Inc.* v. *L'Oreal USA, Inc.*, 458 F. 3d 244, 254 (CA3 2006).

The other argument cited for the Second Restatement's rule is that the losing party may decline to appeal if one of the two bases for a judgment is strong and the other is weak. §27, Comment *i*, at 259. There are reasons to be skeptical of this argument as well. While there may be cases in which the presence of multiple grounds causes the losing party to forgo an appeal, that is likely to be true in only a small subset of cases involving such judgments.

Moreover, other aspects of issue-preclusion doctrine protect against giving binding effect to decisions that result from unreliable litigation. Issue preclusion applies only to questions "actually and necessarily determined," *Montana*, 440 U. S., at 153, and a party may be able to avoid preclusion by showing that it "did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action." Restatement (Second) of Judgments §28(5)(c). To be sure, this exception should not be applied "without a compelling showing of unfairness, nor should it be based simply on a conclusion that the first determination was patently erroneous." *Id.*, §28, Comment *j*, at 284. This exception provides an important safety valve, but it is narrow and clearly does not apply

here. Not only did the Tribe have an opportunity in *Repsis*
to litigate the subject of the alternative ground, it actually
did so.[8]

Finally, regardless of whether alternative grounds
*always* have preclusive effect, it is sufficient to say that, at
least in a declaratory judgment action, each conclusion
provides an independent basis for preclusion. "Since the
very purpose of declaratory relief is to achieve a final and
reliable determination of legal issues, there should be no
quibbling about the necessity principle. Every issue that
the parties have litigated and that the court has under-
taken to resolve is necessary to the judgment, and should
be precluded." 18 Wright, Federal Practice and Procedure
§4421, at 630; see *Henglein* v. *Colt Industries Operating
Corp.*, 260 F. 3d 201, 212 (CA3 2001). Because *Repsis* was
a declaratory judgment action aimed at settling the Tribe's
hunting rights, that principle suffices to bind Herrera to
*Repsis*'s resolution of the occupied-land issue.

## D

Herrera and the United States offer a variety of other
arguments to avoid the preclusive effect of *Repsis*, but all

---

[8] From the beginning of the *Repsis* litigation, Wyoming argued that
Bighorn was occupied land, and the Tribe argued that it was not.
Wyoming pressed this argument in its answer to the Tribe's declaratory
judgment complaint. Record in No. 92–cv–1002, Doc. 29, p. 4. Wyo-
ming reiterated that argument in its motion for summary judgment
and repeated it in its reply. *Id.*, Doc. 34, pp. 1, 6; *id.*, Doc. 54, pp. 7–8.
The Tribe dedicated a full 10 pages of its summary judgment brief to
the argument that "[t]he Big Horn National Forest [l]ands [are]
'[u]noccupied [l]ands'" of the United States. *Id.*, Doc. 52, pp. 6–15.
Both parties repeated these arguments in their briefs before the Tenth
Circuit. Brief for Appellees 20–29 and Reply Brief for Appellants 2–3,
and n. 6, in No. 94–8097 (1995). And the Tribe pressed this argument
as an independent basis for this Court's review in its petition for
certiorari, which this Court denied. Pet. for Cert. in *Crow Tribe of
Indians* v. *Repsis*, O. T. 1995, No. 95–1560, pp. i, 22–24, cert. denied,
517 U. S. 1221 (1996).

are unavailing.

Herrera contends that he is not bound by the *Repsis* judgment because he was not a party, but this argument is clearly wrong. Indian hunting rights, like most Indian treaty rights, are reserved to the Tribe as a whole. Herrera's entitlement derives solely from his membership in the Tribe; it is not personal to him. As a result, a judgment determining the rights of the Tribe has preclusive effect in subsequent litigation involving an individual member of the Tribe. Cf. *Hinderlider* v. *La Plata River & Cherry Creek Ditch Co.*, 304 U. S. 92, 106–108 (1938) (judgment as to water rights of a State is binding on individual residents of State). That rule applies equally to binding judgments finding in favor of and against asserted tribal rights.

Herrera also argues that a judgment in a civil action should not have preclusive effect in a subsequent criminal prosecution, but this argument would unjustifiably prevent the use of the declaratory judgment device to determine potential criminal exposure. The Declaratory Judgment Act provides an equitable remedy allowing a party to ask a federal court to "declare [the party's] rights" through an order with "the force and effect of a final judgment." 28 U. S. C. §2201(a). The Act thus allows a person to obtain a definitive *ex ante* determination of his or her right to engage in conduct that might otherwise be criminally punishable. It thereby avoids "putting the challenger to the choice between abandoning his rights or risking prosecution." *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U. S. 118, 129 (2007). If the Tribe had prevailed in *Repsis*, surely Herrera would expect that Wyoming could not attempt to relitigate the question in this case and in prosecutions of other members of the Tribe. A declaratory judgment "is conclusive . . . as to the matters declared" when the State prevails just as it would be when the party challenging the State is the winning party. Restatement

(Second) of Judgments §33, at 332.

It is true that we have been cautious about applying the doctrine of issue preclusion in criminal proceedings. See *e.g., Currier* v. *Virginia*, 585 U. S. ___, ___ (2018) (slip op., at 9); *Bravo-Fernandez* v. *United States*, 580 U. S. ___, ___ (2016) (slip op., at 4). But we have never adopted the blanket prohibition that Herrera advances. Instead, we have said that preclusion doctrines should have "guarded application." *Id.*, at ___ (slip op., at 4).

We employ such caution because preclusion rests on "an underlying confidence that the result achieved in the initial litigation was substantially correct," and that confidence, in turn, is bolstered by the availability of appellate review. *Standefer* v. *United States*, 447 U. S. 10, 23, n. 18 (1980); see also Restatement (Second) of Judgments §28, Comment *a*, at 274. In *Currier* and *Bravo-Fernandez,* we were reluctant to apply issue preclusion, not because the *subsequent* trial was criminal, but because the *initial* trial was. While a defense verdict in a criminal trial is generally not subject to testing on appeal, summary judgment in a civil declaratory judgment action can be appealed. Indeed, the Crow Tribe did appeal the District Court's decision to the Tenth Circuit and petitioned for our review of the Tenth Circuit's decision. The concerns that we articulated in *Currier* and *Bravo-Fernandez* have no bearing here.[9]

\*   \*   \*

For these reasons, Herrera is precluded by the judgment

———————

[9] Nor is that the only distinction between those cases and this one. In both *Currier* and *Bravo-Fernandez* a party sought preclusion as to an element of the charged offense. The elements of the charged offense are not disputed here—Herrera's asserted treaty right is an affirmative defense. And while the State bears the burden of proof as to elements of the offense, under Wyoming law, the defendant asserting an affirmative defense must state a prima facie case before any burden shifts to the State. See *Duckett* v. *State*, 966 P. 2d 941, 948 (Wyo. 1998).

in *Repsis* from relitigating the continuing validity of the hunting right conferred by the 1868 Treaty. Because the majority has chosen to disregard this threshold problem and issue a potentially pointless disquisition on the proper interpretation of the 1868 Treaty, I respectfully dissent.