**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION, | Nos.   23-35543 23-35544 |
| *Plaintiff-Appellee*, | D.C. No. 4:20-cv-00553-BLW District of Idaho, Pocatello |
| v. | |
| U.S. DEPARTMENT OF THE INTERIOR; UNITED STATES BUREAU OF LAND MANAGEMENT; LAURA DANIEL-DAVIS, Principal Deputy Assistant Secretary for Land and Minerals Management, | ORDER |
| *Defendants-Appellants*, | |
| and | |
| J.R. SIMPLOT COMPANY, | |
| *Intervenor-Defendant*. | |

Filed April 21, 2026

Before: Michelle T. Friedland and Patrick J. Bumatay, Circuit Judges, and Matthew F. Kennelly,[*] District Judge.

Order;
Dissent by Judge Collins;
Dissent by Judge Tung;
Statement by Judge Tung;
Statement by Judges Friedland and Kennelly

## SUMMARY[**]

### Federal Land Policy and Management Act of 1976

The panel denied a petition for panel rehearing and a petition for rehearing en banc in a case in which the panel majority affirmed the district court's summary judgment in favor of the Shoshone-Bannock Tribes of the Fort Hall Reservation in their action challenging a land exchange authorized by the Bureau of Land Management under the Federal Land Policy and Management Act of 1976 (the "FLPMA").

Dissenting from the denial of rehearing en banc, Judge Collins wrote that the panel majority incorrectly concluded that the general authorization to conduct land exchanges under the FLPMA does not vitiate a more specific provision of a 1900 law stating that certain ceded lands from the Fort

---

[*] The Honorable Matthew F. Kennelly, United States District Judge for the Northern District of Illinois, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Hall Indian Reservation "shall be subject to disposal" only under specified categories of laws. He would conclude that the FLPMA's disposal authority is applicable here.

Dissenting from the denial of rehearing en banc, Judge Tung, joined by Judges Callahan, Bennett, R. Nelson, Bumatay, and VanDyke, wrote that the FLPMA can be harmonized with the 1900 Act. The 1900 Act does not bar the operation of the FLPMA, and the FLPMA must accordingly be given effect to authorize the land exchange here. The panel majority misapplied the 1900 Act to bar the operation of the FLPMA.

Respecting the denial of rehearing en banc, Judge Tung wrote in response to Judge Friedland and District Judge Kennelly's statement. He explained that his reading, reinforced by similar laws seeking to achieve a similar purpose, is compatible with the FLPMA, whereas theirs is not.

Respecting the denial of rehearing en banc, Judge Friedland and District Judge Kennelly wrote that, for the reasons explained in the majority opinion, the plain text of the 1900 Act prohibited the Government from conducting this land exchange, and the FLPMA neither repealed nor superseded that Act. They wrote to explain why two new theories about the meaning of the key provision of the 1900 Act raised by Judge Tung's dissent from the denial of rehearing en banc—that the provision operates merely to (1) preclude disposal under certain preexisting land disposal laws but not later-enacted land disposal laws and (2) ensure use of the land for settlement or productive use—were not persuasive.

**ORDER**

Judges Friedland and Kennelly voted to deny Simplot's petition for panel rehearing, and Judge Bumatay voted to grant it. Judge Friedland voted to deny both petitions for rehearing en banc and Judge Kennelly so recommended. Judge Bumatay voted to grant the petitions for rehearing en banc. The full court was advised of the petitions for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 40. Judges Gould and Johnstone did not participate in the deliberations or vote in this case.

The petitions for panel rehearing and rehearing en banc (Dkt. Nos. 129 and 131) are **DENIED**. Judge Collins's and Judge Tung's dissents from the denial of rehearing en banc, Judge Tung's statement respecting the denial of rehearing en banc, and the panel majority's statement in response to the dissents, are filed concurrently herewith. No further petitions for rehearing will be entertained.

COLLINS, Circuit Judge, dissenting from the denial of rehearing en banc:

The panel majority in this case incorrectly resolved an important question in a manner that has potentially significant ramifications for other cases.  We should have granted rehearing en banc, and I dissent from our failure to do so.

The gravamen of the panel majority's argument is that the general authorization to conduct land exchanges under the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq*., does not vitiate a more specific provision of a 1900 law stating that certain ceded lands from the Fort Hall Indian Reservation "shall be subject to disposal" "*only*" under specified categories of laws, *see* Law of June 6, 1900, ch. 813, § 5, 31 Stat. 672, 676 ("the 1900 Act") (emphasis added).  *See Shoshone-Bannock Tribes v. Department of the Interior*, 153 F.4th 748, 759–68 (9th Cir. 2025).  In my view, that conclusion is plainly incorrect.  Indeed, a contrary conclusion follows ineluctably from three undisputed or indisputable premises.

*First*, the panel majority agrees that, because the FLPMA "broadly defines 'public lands' and provides for their disposal by exchange," the plain text of the FLPMA, considered by itself, authorizes the exchange at issue here. *Shoshone-Bannock Tribes*, 153 F.4th at 759; *see also id*. (stating that "it is clear that if the 1900 Act did not exist, FLPMA would permit disposal of the ceded Fort Hall lands").

*Second*, the panel majority also agrees that, notwithstanding the continued presence of the word "only" in § 5 of the 1900 Act, the exclusivity of § 5's list of

authorized disposal methods was vitiated by subsequent statutes that unambiguously authorized additional means of disposing of ceded Fort Hall lands. *See Shoshone-Bannock Tribes*, 153 F.4th at 760 (agreeing that "several other statutes passed after the 1900 Act *did* modify Section 5, including by clearly and expressly adding disposal options for the ceded lands"). And as the panel majority further concedes, *see id*., such legislation included the Act of May 19, 1926 (the "1926 Act"), which stated that the disposal authority in § 2455 of the Revised Statutes is "applicable to the ceded lands on the former Fort Hall Indian Reservation." Ch. 337, 44 Stat. 566, 566. Section 2455, in turn, generally authorized, *inter alia*, the sale, at public auction, of "any isolated or disconnected tract or parcel of the public domain not exceeding one quarter section." *See* Act of Mar. 28, 1912, ch. 67, 37 Stat. 77, 77–78.

*Third*, it is undisputed that an expressly declared purpose of the FLPMA was to establish "uniform procedures for any disposal of public land," 43 U.S.C. § 1701(a)(10), that would replace the prior "chaotic" system of federal land management by "repeal[ing] many of the miscellaneous laws governing disposal of public land," *Lujan v. National Wildlife Fed.*, 497 U.S. 871, 876–77 (1990); *see also Shoshone-Bannock Tribes*, 153 F.4th at 759 (noting that the FLPMA's new uniform procedures were coupled with an immediate repeal of "portions of 147 laws" and a prospective repeal, effective in 10 years, of "an additional 104 laws"). Among the laws that were thus repealed and replaced was the above-described 1926 Act. *See* FLPMA, Pub. L. No. 94-579, § 703(a)(6), 90 Stat. 2743, 2790 (1976).

Taking these three premises together leads inexorably to the conclusion that the FLPMA's disposal authority is applicable here. The 1926 Act had *already* vitiated the

exclusivity of § 5's list of disposal methods; the FLPMA explicitly replaced the *additional* disposal authority granted under the 1926 Act with the general disposal authority conferred under the FLPMA; and the FLPMA's disposal authority concededly applies here by its own terms.  This case is that simple.

The panel majority resists this logic, but its reasons for doing so ignore the FLPMA's text and declared purpose. Although the 1926 Act concededly vitiated the exclusivity of § 5's listed methods, the panel majority refuses to accept the conclusion that the FLPMA's repeal of the 1926 Act's additional disposal authority means that the FLPMA's general disposal authority *replaces* that now-repealed additional authority.  *Shoshone-Bannock Tribes*, 153 F.4th at 760–71.  The panel majority gives two reasons for that conclusion, but neither withstands analysis.

First, the panel majority argues that it would be inappropriate to construe the FLPMA as replacing the repealed 1926 Act's additional authority with the FLPMA's general authority because, unlike the grant of authority under the 1926 Act, the FLPMA's general grant of authority did not "name the ceded Fort Hall Lands."  *Shoshone-Bannock Tribes*, 153 F.4th at 760.  That makes no sense.  The entire purpose of the FLPMA—as is confirmed by its expressly declared statutory policy—was to replace the patchwork of literally hundreds of specific authorities with a general set of "uniform procedures for any disposal of public land."  43 U.S.C. § 1701(a)(10); *see also Shoshone-Bannock Tribes*, 153 F.4th at 775 (Bumatay, J., dissenting) (noting that the FLPMA "explicitly repealed the 1926 Act—a statute that *exclusively* regulates the Fort Hall lands"—and replaced it, and all of the other repealed authorities, "with the FLPMA's uniform disposal and planning procedures").  To refuse to

give effect to this explicit swap of specific provisions for a general provision, and to do so precisely on the ground that the latter is framed in general terms, is simply to defy the statute.

Second, the panel majority reasons that, because the general authority available under the FLPMA is so much broader than the additional authority that had been granted by the 1926 Act, Congress should not be understood to have replaced the latter with the former absent a "clear expression of intent" to derogate from § 5's exclusivity *to that much greater extent*. *Shoshone-Bannock Tribes*, 153 F.4th at 760; *see also id*. at 761 (noting that, unlike the 1926 Act's addition of an "individual narrow disposal option[] onto the 1900 Act's list of permissible disposal options," the FLPMA's "comprehensive framework for land disposal, and its application to the ceded Fort Hall lands," would "broadly enabl[e] disposal of the ceded lands for purposes far outside those encompassed within the categories of laws listed in Section 5"). Nothing supports the panel majority's demand for a clearer statement before it will give effect to the FLPMA's repeal-and-replacement of prior statutory authorities with respect to the 1926 Act.

Moreover, as the panel majority concedes, its refusal to construe the FLPMA as replacing the 1926 Act's additional disposal authority with the FLPMA's general disposal authority means that, as to the Fort Hall lands, the FLPMA actually had the effect of *contracting* the Government's authority to dispose of those lands. The panel majority argues that this counterintuitive conclusion actually makes sense, because another declared policy of the FLPMA is "that 'the public lands be *retained* in Federal ownership.'" *Shoshone-Bannock Tribes*, 153 F.4th at 761 (quoting 43 U.S.C. § 1701(a)(1) (emphasis added by the panel

majority)).  But the panel majority's argument falls apart, because it rests on an improper truncating of the quoted statutory purpose.  What the phrase quoted by the panel majority actually says is that it is a declared policy of the FLPMA that "the public lands be retained in Federal ownership, *unless as a result of the land use planning procedure provided for in this Act, it is determined that disposal of a particular parcel will serve the national interest*."  43 U.S.C. § 1701(a)(1) (emphasis added).  If, as the panel majority concedes, this declared policy applies to the Fort Hall lands, then so too does that policy's reference to the FLPMA's "land use planning procedure" for "determin[ing]" whether a "disposal" of the property is authorized. *Id*.  That the panel majority found it necessary to selectively edit the statutory policy it purported to apply further confirms that its construction of the FLPMA lacks any basis in the statutory text.

For the foregoing reasons, the panel majority plainly erred in resolving the important question presented in this case, and we should have granted rehearing en banc.  I respectfully dissent from our denial of that rehearing.

TUNG, Circuit Judge, joined by CALLAHAN, BENNETT, R. NELSON, BUMATAY, and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

We should have reheard this case en banc. The panel majority misapplies a 125-year-old statute to bar the operation of another statute clearly authorizing the disposal of lands that Indian tribes once owned but had long ago ceded to the federal government. The two statutes are reconcilable; one does not bar the operation of the other. Yet the panel majority forces a confrontation between them in violation of basic rules of statutory interpretation while improperly obstructing the government's administration of its own property. Respectfully, I dissent.

\*       \*       \*

In 1898, the Shoshone-Bannock Tribes sold a portion of their reservation in southeast Idaho to the United States government. The government now wants to transfer some of that land to a company in exchange for land the company owns. The government and company say that the Federal Land Policy and Management Act of 1976 (FLPMA) allows them to carry out the exchange. But the Tribes say that an earlier statute from 1900 bars the exchange despite the Tribes having ceded that land long ago and despite the fact that the FLPMA would otherwise govern the disposal of that land (as the panel majority acknowledges).

Who prevails depends on whether the statutes can be harmonized. The FLPMA allows for the exchange of "public lands"—defined as "any land . . . owned by the United States . . . without regard to how the United States acquired ownership." 43 U.S.C. § 1702(e). There are two "except[ions]" to this definition: land on the "Outer

Continental Shelf," and land "held for the benefit of Indians, Aleuts, and Eskimos." *Id*. Because no exception applies here (as the parties admit), the land the Tribes ceded is "public land[,]" and accordingly, if the exchange procedures in the FLPMA are satisfied, the FLPMA permits the exchange. *Id*.

None of that is in dispute. The only dispute is over how to read the 1900 Act—does it restrict the operation of the FLPMA? Under the 1900 Act, the land at issue was "opened to settlement by the proclamation of the President" and "subject to disposal under the homestead, town-site, stone and timber, and mining laws of the United States only[.]" Act of June 6, 1900, ch. 813, § 5, 31 Stat. 672, 676. The panel majority (and the Tribes) would read the word "only" to prohibit the land exchange otherwise allowed by the later enacted FLPMA because the FLPMA is not one of the "laws" under the 1900 Act permitting "disposal." That reading seems attractive: it is simple, and simple is often right.

But here it is wrong. The panel majority's reading negates the FLPMA, failing the basic rule of statutory interpretation that "[w]hen confronted with two Acts of Congress allegedly touching on the same topic," courts are "not at 'liberty to pick and choose among congressional enactments'" but "must instead strive 'to give effect to both.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (citation omitted). The panel majority picked the 1900 Act over the FLPMA when it should have harmonized the two.

There is a clear way to reconcile them here. Rather than negating the effect of the FLPMA, the word "only" in the 1900 Act served to limit the methods of disposal available at the time the Act was enacted. Besides the federal

homestead, town-site, stone and timber, and mining laws, *other* laws existed at the time that might have otherwise permitted disposal. Inserting the word "only" in the 1900 Act made clear that those *other pre-existing* laws would not apply. Not only is that reading entirely plausible, it respects the rule that an earlier Congress cannot bar a later Congress from adding other means of disposal; indeed, later Congresses made such additions—more than once—after the passage of the 1900 Act.

The word "only" in the 1900 Act served another related purpose: it limited "settlement" of the land pursuant to the enumerated laws, which promoted settlement and cultivation of the land, *to the exclusion* of squatters or speculators who would not make productive use of the land. Many other statutes of the homesteading era, phrased similarly, served that purpose. The word "only" thus provided a limitation, but it did not function to prospectively preempt the FLPMA.

The history of the respective Acts reinforces that conclusion. Both statutes serve differing (albeit overlapping) aims, and are thus best read to provide separate, coexisting grants of authority to the government to dispose of the land. If the government seeks to dispose of the land through "settlement" under the 1900 Act—whose avowed aim was to increase private settlement and encourage cultivation in former territories (indeed, Idaho had become a State just ten years before enactment)—the government can do so through the homestead, town-site, stone and timber, and mining laws only. But if the government seeks to exchange the land under the mechanism provided for in the FLPMA, the government can do so if it complies with the specific requirements set forth in the FLPMA, which aims to balance land-preservation goals with the public interest in land development. Each path for land disposal—either the

1900 Act or the FLPMA—carries its own set of requirements. Disposal under the 1900 Act need not comply with the many requirements governing land exchanges under the FLPMA. Conversely, disposal under the FLPMA need not comply with the limitations under the 1900 Act. The two statutes exist as complementary but separate spheres of land-disposal authority. Just as there can be two different routes to one destination, here there are two ways to dispose of the land, and one does not displace the other.

Yet rather than seek statutory congruence, the panel majority creates a conflict. The panel majority's construal of the 1900 Act to prevent the operation of the FLPMA effectively reads in an exception to the FLPMA's coverage of "public lands." That coverage contains two exceptions already (outer-continental-shelf lands and lands held for the benefit of Indians). But the panel majority rewrites the FLPMA to add a third: land that spans 416,000 acres in Idaho ceded by the Tribes over 125 years ago. Not only is carving out such a gaping hole to the FLPMA's coverage improper, doing so is not necessary to give effect to every word of the 1900 Act, which stands on its own. If anything, should the two acts irreconcilably conflict, the FLPMA (as the later statute) would control—not the other way around.

The panel majority's principal argument to the contrary is unpersuasive. The panel majority tries to justify its judicially created exception to the FLPMA by relying on the "general-specific" canon. But that canon comes into play "when conflicting provisions simply cannot be reconciled." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 183 (2012). Here, as discussed, there is no conflict (nor is there any superfluity), and so the canon need not be deployed. But even assuming a conflict, it is not clear whether the 1900 Act is the more "specific"

provision that would trump the more "general" provisions of the FLPMA. True, the 1900 Act addresses specifically the land ceded by the Tribes whereas the FLPMA addresses all public lands (minus the two statutory exceptions). But the FLPMA provides for land exchanges specifically (whereas the 1900 Act does not). That suggests that the FLPMA might be, in fact, the more specific statute. Regardless, the "general-specific" canon does not assist the panel majority; it cannot be used to displace a reading that harmonizes the FLPMA with the 1900 Act.

Further evidence of the panel majority's flawed opinion comes from its highly unusual implications. There are at least twenty-two statutes, phrased similarly to the 1900 Act, that if construed in the way the panel majority would like, would effectively freeze the sale or exchange of large portions of public land throughout this circuit and beyond. None of this is what Congress could have possibly contemplated. Nor is it at all necessary. Because the 1900 Act does not conflict with the FLPMA, the FLPMA must be given effect.

I respectfully dissent from the denial of rehearing en banc.

## I.

This dispute concerns land in the Snake River Plain of Idaho. Early settlers had built a trading post on this land in 1834 and named it Fort Hall. The fort served as a place to trade fur and other goods and as a rest stop for those headed west along the Oregon trail. After the Civil War, the federal government established on this land the Fort Hall Indian Reservation for the Shoshone-Bannock Tribes who, in turn, sold 416,000 acres of their reservation to the government in 1898. (We will call the land the government now owns the

Fort Hall lands.)  The government now wants to transfer some of that land to an owner who would make productive use of it.

Since 1994, the company J.R. Simplot has sought to acquire that land.  Simplot produces fertilizer of which phosphogypsum (or gypsum) is a by-product.  Simplot will run out of space to store the gypsum unless it acquires a portion of the Fort Hall lands sitting adjacent to its property. In 2020, the Bureau of Land Management approved a land exchange pursuant to the Federal Land Policy and Management Act (FLPMA) whereby the Bureau would transfer to Simplot a portion of the Fort Hall lands in exchange for some of Simplot's lands.

The Tribes sued to stop this exchange.  They invoked an older statute—the 1900 Act—that ratified an 1898 agreement in which the Tribes ceded the Fort Hall lands to the government.  The 1900 Act also provided that the Fort Hall lands "shall be opened to settlement by the proclamation of the President, and shall be subject to disposal under the homestead, town-site, stone and timber, and mining laws of the United States only."  31 Stat. at 676.

The district court granted summary judgment for the Tribes.  Barring the land exchange, the district court held that the 1900 Act precluded application of the FLPMA and ruled, in any event, that the FLPMA's requirements were not satisfied and that the exchange violated the National Environmental Policy Act.  This court, over Judge Bumatay's compelling dissent, affirmed the district court's judgment on the ground that the 1900 Act precluded application of the FLPMA.  *Shoshone-Bannock Tribes of*

*Fort Hall Rsrv. v. U.S. Dep't of the Interior*, 153 F.4th 748, 768 (9th Cir. 2025).[1]

## II.

Resolution of this long-running dispute turns on a simple question: whether the FLPMA can be harmonized with the 1900 Act. The answer is yes. The 1900 Act does not bar the operation of the FLPMA, and the FLPMA must accordingly be given effect to authorize the land exchange here. The text and history of both statutes compel that conclusion. Precedent confirms that answer too.

## A.

The text and history of the FLPMA and the 1900 Act demonstrate that the two statutes do not conflict. Enacted in 1976, the FLPMA is a comprehensive land-management act that sets forth detailed requirements and procedures for how the federal government may dispose of its lands. The FLPMA created "uniform procedures for any disposal of public land," 43 U.S.C. § 1701(a)(10)—in response to the patchwork of "public land laws . . . developed over a long period of years through a series of Acts of Congress which [were] not fully correlated with each other" and which were deemed "inadequate to meet the current and future needs of the American people." Act of Sept. 19, 1964, Pub. L. No. 88-606, § 2, 78 Stat. 982, 982. The FLPMA applies to all "public lands," defined as "any land . . . owned by the United States . . . without regard to how the United States acquired ownership." 43 U.S.C. § 1702(e). There are two exceptions

---

[1] The panel majority did not review the other two grounds that the district court reached. For the reasons stated in Judge Bumatay's dissent, the district court erred on those grounds, too. My dissent focuses on the ground the panel majority relied on.

to this definition—"(1) lands located on the Outer Continental Shelf; and (2) lands held for the benefit of Indians, Aleuts, and Eskimos." *Id*. Neither exception applies here, as the parties do not dispute.

Under the FLPMA, the Secretary of the Interior (acting through the Bureau of Land Management) may dispose of any tract of public land through an "exchange." 43 U.S.C. § 1716(a). The Secretary may pursue an "exchange" if he "determines that the public interest will be well served" after giving "full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy" and "cultural resources" (among several other factors). *Id*.; 43 C.F.R. § 2200.0-6(b). The Secretary must also "find[] that the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands or interests and the public objectives they could serve if acquired." 43 U.S.C. § 1716(a). Furthermore, the FLPMA requires that the lands exchanged be of "equal" value, and that "if they are not equal, the values shall be equalized by the payment of money." 43 U.S.C. § 1716(b). These provisions (along with others) governing the procedures for conducting an exchange of public lands make up part of the comprehensive, reticulated scheme established by Congress for land disposal under the FLPMA. The panel majority does not dispute that the FLPMA covers the Fort Hall lands that the Bureau wishes to exchange in return for Simplot's land—indeed, the panel majority concedes that "it is *clear*" (absent the 1900 Act) that the "FLPMA would permit disposal of the ceded Fort Hall lands." *Shoshone-Bannock Tribes*, 153 F.4th at 759 (emphasis added).

But the panel majority erroneously interprets the 1900 Act to block the operation of the FLPMA because of a single word ("only") in the 1900 Act. No doubt, one word can make all the difference. *See, e.g.*, *Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021). But a word must be read in context, not divorced from it. Here, the panel majority fails to read "only" in its proper context and deploys the word to "prospective[ly] pre-empt[]" the FLPMA. *Washington Post Co. v. U.S. Dep't. of State*, 685 F.2d 698, 707 (D.C. Cir. 1982) (Scalia, J., statement on the denial of rehearing en banc) (citation omitted). The 1900 Act states (in relevant part) that the Fort Hall lands "shall be opened to settlement by the proclamation of the President, and shall be subject to disposal under the homestead, town-site, stone and timber, and mining laws of the United States only." 31 Stat. at 676. No one disputes that the word "only" denotes a limitation and must be given effect.

But the question is what effect. Here, context plausibly suggests that the word "only" does not operate to prospectively preempt the FLPMA. Rather, it served to exclude other laws that existed at the time of the 1900 Act's enactment, such as the desert lands laws or the isolated-tract laws, which might have otherwise permitted disposal. *See* Desert Lands Act of 1877, ch. 107, 19 Stat. 377; Rev. Stat. § 2455 (1878) (Isolated Tracts). Context also shows that the word "only" must be read in light of the Act's clearly expressed aim of "open[ing]" the land to "settlement." The word thus served to limit the "settlement" of the Fort Hall lands pursuant to the enumerated laws encouraging settlement and cultivation *to the exclusion* of speculators and squatters who would not make productive use of the land. *See Annual Report of the Commissioner of the General Land Office* 3 (1890) ("The great object of the Government is to

dispose of the public lands to actual settlers only—to bona fide tillers of the soil[.]"); Paul W. Gates, *U.S. Pub. Land L. Rev. Comm'n, History of Public Land Law Development* 394–95 (1968); *see also* Brief for the National Mining Ass'n as Amicus Curiae Supporting Appellants, pp. 8–9, 18–23.

An examination of the enumerated laws makes this clear. The homestead, town-site, stone and timber, and mining laws (referred to in the 1900 Act) required proof that the proposed settler would in fact live on the land or put it to productive use before a land patent would issue. *See, e.g.*, Act of Mar. 3, 1891, ch. 561, § 5, 26 Stat. 1095, 1096–97. The 1900 Act promoted settlement in the newly opened former territories, and by using the word "only," the Act sought to avoid disposal of those lands to speculators and squatters who would not advance the Act's purpose. Statutes enacted around this time of homesteading confirm this reading: they used similar language as the 1900 Act to ensure that settlers (not squatters or speculators) would live on or cultivate the land—land (like the Fort Hall lands) that had been ceded by tribes to the federal government. *See, e.g.*, Act of Jan. 14, 1889, ch. 24 § 6, 25 Stat. 642, 644 (Minnesota) ("[T]he said agricultural lands so surveyed, shall be disposed of by the United States to actual settlers only under the provisions of the homestead law[.]").[2]

---

[2] *See also, e.g.*, Act of Feb. 13, 1891, ch. 165, § 7, 26 Stat. 749, 759 (Oklahoma) (These lands "shall be disposed of to actual settlers only, under the provisions of the homestead laws."); Act of Mar. 3, 1891, ch. 543 § 22, 26 Stat. 989, 1031 (Idaho) ("That all lands so sold and released to the United States . . . shall be disposed of by the United States to actual settlers only, under the provisions of the homestead law[.]"); *id.* § 25, 26 Stat. at 1035 (North Dakota) (These lands "shall be disposed of to actual settlers only under the provisions of the homestead laws."); *id.* § 34, 26 Stat. at 1043 (Montana) (These lands "shall, except mineral lands, be

Read in context, then, the word "only" was meant to address the issue of ensuring actual settlement or cultivation and to exclude preexisting disposal laws from application.  It was *not* meant to preclude a later Congress from adding new ways of disposing of the land.  Indeed, notwithstanding the word "only" in the 1900 Act, Congress subsequently added new methods of land disposal in the intervening years leading up to the FLPMA's enactment.  *See* Act of May 19, 1926, ch. 337, 44 Stat. 566 ("1926 Act") (adding disposal options for isolated tracts); Act of May 4, 1932, ch. 164, 47 Stat. 146 ("1932 Act") (adding disposal options for "desert lands").   And Congress did so without repealing or modifying the 1900 Act.  Just as those intervening additions did not conflict with or repeal the 1900 Act, the FLPMA does not either.

This interpretation of "only" is thus not just plain from context; it avoids that fatal error the panel majority fell into, which was to construe the word "only" to negate the effect of another statute—the FLPMA.   "When confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at 'liberty to pick and choose among congressional enactments' and must instead strive 'to give effect to both.'"  *Epic Sys. Corp.*, 584 U.S. at 510 (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).  Rather than seeking to preserve both statutes, the panel majority sets up a clash.   As discussed, the FLPMA authorizes the land exchange here.   But to read the 1900 Act (as the panel majority does) to categorically prohibit that exchange

---

disposed of to actual settlers only, under the provisions of the homestead laws."); Act of Mar. 3, 1893, ch. 203, § 3, 27 Stat. 557, 563 (Oklahoma) (These lands "shall be disposed of . . . to actual settlers only, under the provisions of the homestead and town-site laws.").

creates an unnecessary statutory conflict. The Supreme Court's instruction that courts must "strive to give effect to both [statutes]" thus requires us to reject the panel majority's reading. "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow." *Id.* (quoting *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995)). The panel majority comes nowhere close to meeting that burden.

The two statutes can coexist easily. The 1900 Act and the FLPMA serve as related but separate grants of authority to the Bureau to dispose of the Fort Hall lands. As Judge Bumatay explained, "Congress granted the federal government *two* independent ways to dispose of the land involved in the exchange—the 1900 Act and [the] FLPMA." *Shoshone-Bannock Tribes*, 153 F.4th at 772 (Bumatay, J., dissenting) (emphasis in original). "As complementary grants of authority to dispose of land, the Bureau could follow either." *Id*. And if the Bureau chooses to follow the 1900 Act, it could dispose of land via *only* the "four paths" under the 1900 Act. *Id*. But if the Bureau chooses to follow the FLPMA, then the land could be exchanged only if the requirements of the FLPMA are met—*i.e.*, that the exchange "well serve[s]" the "public interest" in light of the factors set forth in the FLPMA. *See id*. at 768 (quoting 43 U.S.C. § 1716(a)). And whereas the FLPMA authorizes land *exchanges* and not just sales (in furtherance of one of its aims of preserving land), the 1900 Act does not appear to do so (where its aim was to promote settlement). Put simply, each statute contains its own requirements. Neither statute displaces the other.

Rather than harmonizing the two statutes, the panel majority effectively revises the FLPMA by adding an exception to the Act's definition of "public lands." The FLPMA contains two exceptions (outer-continental-shelf lands and lands held for the benefit of the Indians and other groups)—and two exceptions only. Where (as here) "Congress explicitly enumerates certain exceptions" to a definition, "additional exceptions are not to be implied" by a court. *Andrus v. Glover Const. Co.*, 446 U.S. 608, 616–17 (1980). Yet the panel majority improperly does just that—carving out a third exception to the FLPMA that includes the Fort Hall lands.

The panel majority's reading runs into other problems. A basic rule of construction is that an earlier Congress cannot bind a later one. *Reading Law* at 278–80; *Dorsey v. United States*, 567 U.S. 260, 274 (2012). Related to that rule is the "principle of statutory construction that a later-enacted statute that contradicts an earlier one effectively repeals it." *Reading Law* at 185. Under the (correct) view that the FLPMA and the 1900 Act do not conflict, these rules of construction do not come into play. But on the panel majority's reading, which posits a conflict between the statutes, those two rules would apply. And the panel majority's reading violates them both.

*First*, under the panel majority's logic, the 1900 Act bars Congress from modifying or repealing the Act unless Congress provides a clear statement expressing that intent (which, in the panel majority's view, requires mention of the Fort Hall lands specifically). *Shoshone-Bannock Tribes*, 153 F.4th at 759–61. But that clear-statement requirement contravenes the rule against legislative entrenchment. "[T]here is no legal effect to a statutory provision stating that any exceptions to the statute's requirements must be express,

or must specifically refer to the statute." *Reading Law* at 279. Here, not even the 1900 Act itself contains an "express" statement requirement, which would have "no legal effect"; all the more improper is it for the panel majority to infer such a requirement to deny a later statute its effect.

*Second*, even assuming that the two statutes conflict, it is the FLPMA as the later-enacted statute that would control. *See Reading Law* at 185, 327–29; *Posadas v. Nat'l City Bank of New York*, 296 U.S. 497, 503 (1936). "When the plain import of a later statute directly conflicts with an earlier statute, the later enactment governs, *regardless* of its compliance with any earlier-enacted requirement of an express reference or other 'magical password.'" *Lockhart v. United States*, 546 U.S. 142, 149 (2005) (Scalia, J., concurring) (emphasis in original); *see also* 43 U.S.C. § 1715(a) ("*Notwithstanding any other provisions of law*, the Secretary . . . [is] authorized to acquire pursuant to [the FLPMA] by purchase, *exchange*, donation, or eminent domain, lands or interests therein[.]") (emphases added). The panel majority thus gets it backwards when it holds that the earlier enacted 1900 Act controls over the later enacted FLPMA, even though the FLPMA was enacted specifically to address the patchwork of land laws, which include the 1900 Act.

The panel majority nevertheless says that the canon against implied repeals requires that result. It does not. At the outset (and again), under the correct reading of the two statutes that gives effect to both, there is no "repeal" at all, so the canon of implied repeal need not be invoked. But even assuming the relevance of the canon, so long as any conflict was "clear enough to overcome the presumption against implied repeal" (*Reading Law* at 279), the FLPMA would control. And here the conflict (under the panel majority's

reading) is "clear enough" where the panel majority would use the 1900 Act to bar the FLPMA's operation. It is true, as the panel majority points out, that the FLPMA states that "[n]othing in this Act shall be deemed to repeal any existing law by implication." § 701(f), 90 Stat. at 2786. But that just restates the presumption against implied repeals (*see Lockhart*, 546 U.S. at 149 (Scalia J., concurring)), which as discussed can be overcome when there is clear incompatibility created by the panel majority's reading.

The panel majority seeks to deploy two other canons of construction, but neither applies. First, the panel majority invokes the "general-specific" canon to deny the FLPMA's effect. But that canon "deals with what to do when conflicting provisions simply cannot be reconciled—when the attribution of no permissible meaning can eliminate the conflict." *Reading Law* at 183; *see In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1225 (9th Cir. 2019). The canon thus does not apply where, as here and again, there is no conflict (or superfluity) between the two statutes. The panel majority's repeated invocation of canons that *presume conflict* between statutes underscores its refusal to harmonize where permissible. "[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously." *Reading Law* at 180. "The imperative of harmony among provisions is more categorical than most other canons of construction," such as the "general/specific canon." *Id*.

Even assuming the canon's application, however, it is not clear *which* statute is more specific and thus controlling. The panel majority says that the 1900 Act addresses the Fort Hall lands and so is the more specific statute. But the FLPMA also addresses those lands—through a repeal of a statute that had added a disposal option for the Fort Hall

lands. *See* § 703(a)(6), 90 Stat. at 2790. Moreover, the FLPMA was designed to address the patchwork of land laws of which the 1900 Act was a part, and so to conclude that the 1900 Act nevertheless controls as the more "specific" statute over the FLPMA would appear to contravene the very aim of the FLPMA. The panel majority cites no example of the "general-specific" canon being deployed in such a circumstance.

The FLPMA might even be viewed as the more specific statute—after all, the FLPMA addresses land *exchanges* specifically, whereas the 1900 Act does not, referring to "disposal" more generally. *See Reading Law* at 187. The FLPMA contains specific, detailed requirements for when an exchange can take place, whereas the 1900 Act refers to other "laws" more generally. Accordingly, the panel majority's reliance on *Radzanower v. Touche Ross & Co.*, 426 U.S. 148 (1976), is of no assistance. There, a more specific venue statute prevailed over a more general one. By contrast here, the FLPMA statute might be the more specific statute that controls. All this, however (and again), is beside the point, since the FLPMA and the 1900 Act can each be given effect without applying the canon.

As a last resort, the panel majority invokes the "Indian canons of construction." *Shoshone-Bannock Tribes*, 153 F.4th at 765. But, as the panel majority itself suggests, there must be "[an] ambiguity as to whether [the] FLPMA repeals or supersedes the 1900 Act's restrictions on disposal" for the canons to apply. *Id*. No ambiguity exists here; as discussed, the statutes can each be given effect without one "repeal[ing] or supersed[ing]" the other. The panel majority nevertheless seeks to impose another "clear statement" hurdle, since the FLPMA might be construed to "abrogate" the Tribes' "treaty rights." *Id*. But any "right" that the Tribes possessed to use

the land for certain purposes, under the 1898 agreement, was unambiguously conditioned on the land "remain[ing] part of the public domain." Art. IV, 31 Stat. at 674 ("So long as any of the lands ceded, granted, and relinquished under this treaty remain part of the public domain . . . ."). Nothing in the agreement restricts the federal government's ability to remove the land from the public domain in the first place. To be sure, the FLPMA and section five of the 1900 Act place restrictions. But those statutory provisions did not grant (or ratify) any "treaty rights." Those provisions merely set forth processes by which lands can be removed from the public domain.

The Indian canons do not apply in this circumstance. The application of the Indian canons presupposes a "conflict" between the consequences of following those statutory processes (on the one hand) and "treaty rights" (on the other). *Shoshone-Bannock Tribes*, 153 F.4th at 765 (quoting *Minnesota v. Mile Lacs Band of Chippewa Indians*, 526 U.S. 172, 202–03 (1999)). But here there is no "conflict" where the purported "treaty rights" already contemplate that the lands could be removed from the public domain (through statutory processes or otherwise). "[T]his court is bound to give effect to the stipulations of the treaty in the manner and to the extent which the parties have declared, and not otherwise. We are not at liberty to dispense with *any of the conditions* or requirements of the treaty, or to take away *any qualification* or integral part of any stipulation[.]" *United States v. Choctaw Nation*, 179 U.S. 494, 533 (1900) (internal citation removed) (emphases added).

*Herrera v. Wyoming*, 587 U.S. 329 (2019), which the panel majority cites, is not to the contrary. There, the Crow Tribe had a "treaty right" to "hunt on the unoccupied lands

of the United States so long as game may be found thereon" and "peace subsists . . . on the borders of the hunting districts." *Id.* at 332. The Court held that the Tribe's right did not expire when Wyoming became a State. *Id.* at 333. The Court reasoned that Wyoming's entrance into the Union was not one of the express treaty conditions, which if satisfied, would have resulted in the termination of the Crow Tribe's "treaty right." Here by contrast, removal from the public domain is an express "termination point" of the Tribes' right to use the land. *Id.* at 341. As *Herrera* stated, "the crucial inquiry for treaty termination analysis is whether Congress has expressly abrogated an Indian treaty right *or whether a termination point identified in the treaty itself has been satisfied.*" *Id.* (emphasis added). The termination point of any "usufructuary right" that the Tribes had—to hunt or cut timber on the land—will be satisfied when the land is exchanged pursuant to the FLPMA.

In the end, the panel majority can point to no precedent for its peculiar use of the Indian canons to justify its result here: blocking the government's disposal of public lands even though (1) the agreement between the government and the Tribe confers "treaty rights" that are contingent upon those lands remaining in the public domain and (2) the agreement places no restrictions on disposal. Nor does the panel majority cite any authority for using Indian canons to create a clash between two statutory provisions when they plainly can be reconciled.

## B.

In contrast to the panel majority's scant support for its result, this court's precedent requires that the FLPMA be given effect to authorize disposal. *Blackfeet Indian Tribe v. Montana Power Co.*, 838 F.2d 1055 (9th Cir. 1988), is

directly on point. There, this court strove to harmonize two apparently conflicting statutes—one statute (from 1904), which stated that rights-of-way granted by the Secretary of Interior for oil and gas pipelines across Indian reservations "*shall not extend beyond a term of twenty years*"; and a later-enacted statute (from 1948), which stated that rights-of-way may be granted by the Secretary for "all purposes, subject to such conditions as he may prescribe." *Id.* at 1056 (emphasis added). Pursuant to this later statute, the Secretary promulgated a regulation that allowed "rights-of-way for oil and gas pipelines for a period *not to exceed fifty years*." *Id.* at 1057 (emphasis added). The Secretary granted a power company rights-of-way for a 50-year term across the Blackfeet Indian Reservation, and the Blackfeet Tribe sued, arguing that the rights-of-way had to be limited to 20 years. *Id*. at 1055–56.

This court rejected the Tribe's argument. While acknowledging that the earlier statute was the more "specific" statute, and that "legal ambiguities" are resolved "in favor of Indians," the court nevertheless held that the later statute remained in effect. *Id.* at 1058. It reasoned that the two statutes "can be read as coexisting" and that "[t]he former allows a term of 20 years, the later a term of 50 years." *Id.* "[T]he two Acts are not in direct conflict," this court concluded, "and effect can be given to each while still preserving their sense and purpose." *Id.*; *see also, e.g.*, *Negonsott v. Samuels*, 507 U.S. 99, 105–06 (1993).

That rationale applies with equal force here. The FLPMA and the 1900 Act can "coexist[]" and "are not in direct conflict." *Blackfeet*, 838 F.2d at 1058. The FLPMA allows disposal of land through an exchange; the 1900 Act allows disposal of land through the four enumerated settlement laws. Even if the FLPMA were deemed "more

general" than the 1900 Act, "effect can be given to each" while "preserving their sense and purpose." *Id.* The FLPMA does not repeal the 1900 Act, and the 1900 Act does not preempt the FLPMA. Just as in *Blackfeet*, the two statutes can plainly be harmonized, and neither the general-specific canon nor the Indian canons can be deployed to disrupt that harmony.

The panel majority tries to evade *Blackfeet*'s clear holding by noting that the Tribe "consent[ed]" to the 50-year term. *Shoshone-Bannock Tribes*, 153 F.4th at 764. But regardless of the Tribe's consent, the Tribe argued that the specific, earlier *statute* prohibited the Secretary's grant of a 50-year term to the power company. This court rejected that argument, and the basis of its rejection was that the two statutes "can be read as coexisting" (*Blackfeet*, 838 F.2d at 1058), just as the statutes can be done here. The panel majority's attempt to distinguish *Blackfeet* thus fails.

*      *      *

En banc review should have been granted not just because the panel majority's interpretation is wrong. The decision will severely hamper the federal government's ability to administer its lands, including its ability to sell or exchange lands to promote economic development or sustain jobs in local communities. This outcome could not have possibly been Congress's aim.

Several late-nineteenth-century statutes, which contain language similar to that used in section 5 of the 1900 Act, are still on the books. *See, e.g.*, Act of July 4, 1884, ch. 180, 23 Stat. 76, 80 (Washington) ("[T]he remainder of said reservation to be thereupon restored to the public domain, and shall be disposed of to actual settlers under the

homestead laws only[.]").[3]    Those statutes cover large
portions of public land throughout this circuit (and beyond).

---

[3] *See also, e.g.*, Act of May 1, 1888, ch. 213 § 3, 25 Stat. 113, 133
(Montana) (These lands "are open to the operation of the laws regulating
homestead entry . . . and to entry under the town site laws and the laws
governing the disposal of coal lands, desert lands, and mineral lands; but
are not open to entry under any other laws."); Act of Jan. 14, 1889, ch.
24 § 6, 25 Stat. 642, 644 (Minnesota) ("[T]he said agricultural lands so
surveyed, shall be disposed of by the United States to actual settlers only
under the provisions of the homestead law[.]"); Act of Mar. 1, 1889, ch.
317 § 2, 25 Stat. 757, 759 (Oklahoma) (These lands "shall only be
disposed of in accordance with the laws regulating homestead entries,
and to the persons qualified to make such homestead entries."); Act of
Mar. 2, 1889, ch. 412, § 13, 25 Stat. 980, 1005 (Oklahoma) (These lands
"shall be disposed of to actual settlers under the homestead laws only.");
Act of Feb. 13, 1891, ch. 165, § 7, 26 Stat. 749, 759 (Oklahoma) (These
lands "shall be disposed of to actual settlers only, under the provisions
of the homestead laws."); Act of Mar. 3, 1891, ch. 543 § 22, 26 Stat. 989,
1031 (Idaho) ("That all lands so sold and released to the United
States . . . shall be disposed of by the United States to actual settlers only,
under the provisions of the homestead law[.]"); *id*. at § 25, 26 Stat. at
1035 (North Dakota) (These lands "shall be disposed of to actual settlers
only under the provisions of the homestead laws."); *id*. at § 30, 26 Stat.
at 1039 (North and South Dakota) (These lands "shall…be subject only
to entry and settlement under the homestead and town-site laws of the
United States."); *id*. at § 34, 26 Stat. at 1043 (Montana) (These lands
"shall, except mineral lands, be disposed of to actual settlers only, under
the provisions of the homestead laws."); Act of July 13, 1892, ch. 164
§ 1, 27 Stat. 120, 124 (Idaho) ("[T]he following tract of land . . . is . . .
subject to entry only under the town-site laws of the United States[.]");
Act of Mar. 3, 1893, ch. 203, § 3, 27 Stat. 557, 563 (Oklahoma) (These
lands "shall be disposed of . . . to actual settlers only, under the provisions
of the homestead and town-site laws."); Act of Aug. 15, 1894, ch. 290,
§ 12, 28 Stat. 286, 319 (South Dakota) ("That the lands . . . shall be
subject to disposal only under the homestead and town-site laws[.]"); *id*.
at § 16, 28 Stat. at 332 (Idaho) ("[T]he lands so ceded . . . shall be subject
to disposal only under the homestead, town-site, stone and timber, and
mining laws[.]"); Act of June 10, 1896, ch. 398, § 8, 29 Stat. 321, 353

And because nearly all the homesteading (and other settlement) laws, which are referred to in those statutes, have been either repealed or suspended (*See, e.g.*, §§ 702–03, 90 Stat. at 2787–91), the consequence of the panel majority's erroneous ruling would be effectively to freeze the government's ability to dispose of those lands, preventing the government from putting its own lands to higher and better uses.  These are not just lands that tribes had ceded to the government over 120 years ago.  They also include lands once occupied by military posts (erected by the U.S. Army but since abandoned) and that Congress in the late nineteenth century opened to settlement.  *See* Act of May 14, 1890, ch. 204, 26 Stat. 107 (Colorado and Nebraska) ("That the lands embraced in the former military reservation known as the Fort Sedgwick . . . shall . . . be subject to disposal, to actual settlers thereon, . . . according to the provisions of the homestead laws only[.]").[4]

---

(Montana) ("[T]he lands so surrendered shall be opened to occupation, location, and purchase, under the provisions of the mineral-land laws only[.]"); *id*. at § 9, 29 Stat. at 357 (Montana) ("[T]he lands so surrendered shall be opened to occupation, location, and purchase under the provisions of the mineral-land laws only[.]"); *id*. at § 10, 29 Stat. at 360 (Arizona) ("[T]he lands so surrendered shall be opened to occupation, location, and purchase under the provisions of the mineral-land laws only[.]"); Act of June 7, 1897, ch. 3, § 12, 30 Stat. 62, 96 (Wyoming) ("[T]he remainder of the said lands . . . are . . . subject to entry, however, only under the homestead and town-site laws[.]").

[4] *See also, e.g.*, Act of Oct. 1, 1890, ch. 1239, 26 Stat. 561 (Nevada) ("That all the agricultural lands embraced . . . be disposed of under the homestead laws, and not otherwise."); *id*. at ch. 1240, 26 Stat. at 561 (Colorado) ("That the lands embraced . . . shall . . . be subject to disposal, to actual settlers thereon . . . according to the provisions of the homestead laws only[.]"); Act of Dec. 22, 1892, ch. 12, 27 Stat. 408, 408–09 (Wyoming) ("That all public lands now remaining undisposed of within

It is inconceivable that Congress would have sought to trap those lands in frontier amber.  As discussed, Congress enacted the FLPMA in response to the many scattered statutes governing these (and other) lands.  To construe the pre-FLPMA patchwork of laws as *disabling* the operation of the FLPMA when the very purpose of the FLPMA was to provide an alternative to it—to flip the FLPMA on its head in that way—would be irrational.  I respectfully dissent.

---

TUNG, Circuit Judge, respecting the denial of rehearing en banc:

I write in response to Judge Friedland and Judge Kennelly's statement.

*First*, their statement claims that my dissent "omits a critical fact"—that the Acts of 1926 and 1932 refer to the Fort Hall lands—and that such a reference (unlike the FLPMA's more comprehensive coverage) "effectively modif[ies]" the 1900 Act.  Maj. Statement 35–36.  That argument is incorrect.  The Acts of 1926 and 1932 no more modify the 1900 Act than does the FLPMA.  Whether or not the 1900 Act is modified, the Acts of 1926 and 1932 provide an alternative means of disposal of the Fort Hall lands—as does the FLPMA.  All three statutes, as the panel majority admits, cover the Fort Hall lands; thus, if the Acts of 1926 and 1932 authorize disposal, the FLPMA does too.  Indeed, as Judge Collins emphasizes in his separate dissent, the fact that the FLPMA *replaced* the 1926 Act's authorization reinforces the conclusion that the FLPMA supplies an

---

the abandoned military reservations . . . are hereby made subject to disposal under the homestead law only[.]").

alternative means of disposal of the Fort Hall lands compared to what the 1900 Act allows.  *See* Collins Dissent 7.

To say, as the panel majority does, that the Acts of 1926 and 1932 authorize disposal because they expressly mention "Fort Hall" but that the FLPMA fails to authorize disposal because it makes no such mention—even though all three statutes indisputably cover the Fort Hall lands—is, quite literally, to impose a magic-words test that our precedents forbid.  *Marcello v. Bonds*, 349 U.S. 302, 310 (1955); *Great Northern R. Co. v. United States*, 208 U.S. 452, 465 (1908); *see also Lockhart v. United States*, 546 U.S. 142, 149 (2005) (Scalia, J., concurring)).

*Second*, the panel majority now appears to recognize that the enumerated laws, referred to in the 1900 Act, may have *excluded* non-settlement and non-productive uses of the land; yet it chooses not to give the word "only" a meaning consistent with that view.  Maj. Statement 36.  Rather, it continues to construe the word "only" in the broadest way possible—to negate the effect of subsequent legislation that clearly authorizes the disposal of the land.  As my dissent explains, the harmonization canon is cardinal, and the panel majority disregards it entirely.  *See* Tung Dissent 20–21, 24. To be sure, the panel majority invokes other canons, such as the Indian Canons.  *See* Maj. Statement 37.  But it still cites no authority for deploying those other canons to create (rather than resolve) statutory conflict.  The panel majority's refusal to harmonize remains its Achilles' heel.

The panel majority faults my reading as "strained" because "other similar laws" appeared to have codified my reading more "more directly."  *Id.*  But at least my reading, reinforced by similar laws seeking to achieve a similar

purpose, has the one advantage that Judge Friedland and Judge Kennelly's reading does not—mine is compatible with the FLPMA; whereas theirs is not. My reading need not "outrun the bear"; it need only outrun theirs. *See* Hon. Neil M. Gorsuch, 2016 Sumner Canary Memorial Lecture: *Of Lions and Bears, Judges and Legislators, and the Legacy of Justice Scalia*, 66 Case W. Rsrv. L. Rev. 905, 918 (2016). Here it does.

---

FRIEDLAND, Circuit Judge, and KENNELLY, District Judge, respecting the denial of rehearing en banc:

For the reasons we explained in our opinion, the plain text of the statute codifying the Shoshone-Bannock Tribes' land cession agreement, the Act of June 6, 1900, ch. 813, 31 Stat. 672 ("1900 Act"), prohibits the Government from conducting this land exchange, and the general land management statute, the Federal Land Policy and Management Act of 1976 ("FLPMA"), neither repealed nor superseded that Act. Our court therefore rightly denied rehearing en banc. We write only to address two new theories about the meaning of the key provision of the 1900 Act raised by Judge Tung's dissent from the denial of rehearing en banc: that the provision operates merely to (1) preclude disposal under certain preexisting land disposal laws but not later-enacted land disposal laws, and (2) ensure use of the land for settlement or productive use. Tung Dissent at 11-13, 18-20.[1]

---

[1] Our opinion already addresses the arguments raised in Judge Collins's dissent, so we do not discuss them further here.

This case turns on the meaning of the word "only" in Section 5 of the 1900 Act.  The Act states that, after land allotments are made to certain individual Tribal members, "the residue of said ceded lands shall be opened to settlement by the proclamation of the President, and shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States *only*."  Act of June 6, 1900, Ch. 813, § 5, 31 Stat. 672, 676 (emphasis added).  Our opinion interpreted that provision to limit land disposal to the exclusive list of types of laws that "only" follows.  The alternative interpretations of the 1900 Act's use of the word "only" offered by Judge Tung's dissent do not cast doubt on our analysis.

First, Judge Tung's dissent argues that "only" does not operate to exclude land disposal laws enacted after the 1900 Act, instead serving to exclude only laws that already existed in 1900.  Tung Dissent at 11-12, 18-19.  In support of that idea, Judge Tung's dissent claims that Congress subsequently enacted two laws that "added new methods of land disposal" for the Fort Hall lands "without repealing or modifying the 1900 Act."  Tung Dissent at 20.  But Judge Tung omits a critical fact about those two laws: both specifically provided that they were "applicable to the ceded lands on the former Fort Hall Indian Reservation."  Act of May 19, 1926, ch. 337, 44 Stat. 566 (making a prior statute on disposal of isolated tracts of land "applicable to the ceded lands on the former Fort Hall Indian Reservation"); Act of May 4, 1932, ch. 164, 47 Stat. 146 (making a prior statute on disposal of desert lands "applicable to the ceded lands on the former Fort Hall Indian Reservation").  Thus, when Congress wanted to add disposal options for the Fort Hall lands beyond those set forth in the 1900 Act's exclusive list, it did so by enacting laws that referenced the land governed

by the 1900 Act, thereby effectively modifying the 1900 Act's exclusive list. Those express references to the land at issue here made the 1926 Act and the 1932 Act entirely unlike FLPMA, which, by contrast, evinces no indication of any intent to modify or repeal the 1900 Act.**[2]** Because Congress never repealed the 1900 Act—through FLPMA or otherwise—the 1900 Act precludes this land exchange.

Second, Judge Tung theorizes that the word "only" was meant to limit "settlement" of the ceded Fort Hall lands to enumerated laws that "promoted settlement and cultivation of the land, *to the exclusion* of squatters or speculators who would not make productive use of the land." Tung Dissent at 12 (emphasis in original). We agree that "only" modifies the list of laws through which the land may be disposed, but we struggle to see why the fact that those laws may have each promoted productive use undermines our opinion's conclusion that the 1900 Act's list is exclusive. Judge Tung's reading also seems strained, given that Congress could have expressed a focus on settlers or productive use more directly if that were Congress's intent, as it did in the contemporary enactments that Judge Tung identifies. Tung Dissent at 19-20 & n.2 (citing, among other similar laws, the Act of Jan. 14, 1889, ch. 24 § 6, 25 Stat. 642, 644 ("[T]he

---

[2] Rather than repeal the 1900 Act, as our opinion explains, FLPMA expressly repealed or struck portions of 147 laws and marked an additional 104 laws for repeal effective on FLPMA's tenth anniversary, but the 1900 Act was not among those laws, and FLPMA never specifically referenced the Fort Hall lands. Pub. L. No. 94-579 §§ 702-03, 90 Stat. 2743, 2787-91 (1976). Indeed, in Section 701 of FLPMA, Congress emphasized the exclusivity of that list, stating that outside of the list of explicitly repealed laws, "[n]othing in this Act shall be deemed to repeal any existing law by implication." Pub. L. No. 94-579, § 701(f), 90 Stat. 2743, 2786 (1976).

said agricultural lands so surveyed, shall be disposed of by the United States to actual settlers only under the provisions of the homestead law.")). But to the extent that there is any ambiguity as to which understanding of the 1900 Act and its interaction with FLPMA is correct, we must invoke the Indian Canons of Construction. As our opinion explained, those canons require that any ambiguity be resolved in the Tribes' favor.

The new arguments offered by Judge Tung are accordingly no more persuasive than the others that our opinion already disproved. Our court was correct to decline to reconsider our decision en banc.